UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GRAND RIVERS COMMUNITY BANK and MAIN STREET BANCSHARES, INC.<br><br>Plaintiffs,<br><br>v.<br><br>MARKET STREET BANCSHARES, INC.; PEOPLES NATIONAL BANK, N.A.; FRANK WILLIAM BONAN; FRANK WILLIAM BONAN II; and H. KEITH BOTSCH,<br><br>Defendants. | Case No. __________________________ |

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

Plaintiffs Grand Rivers Community Bank and Main Street Bancshares, Inc., (collectively, the "Plaintiffs") by counsel, hereby file their *Complaint for Damages and Declaratory Relief* against Market Street Bancshares, Inc.; Peoples National Bank, N.A.; Frank William Bonan; Frank William Bonan II; and H. Keith Botsch (collectively, the "Defendants") and allege and state as follows:

**INTRODUCTION**

1. The Plaintiffs bring this civil action against the Defendants seeking damages for violations of federal RICO laws, as well as damages for state law claims of financial institution fraud, fraudulent misrepresentation, breach of fiduciary duty, and fraud. Additionally, the Plaintiffs seek declaratory relief from the Court against certain Defendants.

## PARTIES AND RELATED PERSONS

2. Grand Rivers Community Bank ("Grand Rivers") is an Illinois state-chartered bank that is supervised by the Federal Deposit Insurance Corporation (the "FDIC") and the Illinois Department of Financial and Professional Regulation, Division of Banking. Grand Rivers' principal offices are located in Grand Chain, Illinois.

3. Main Street Bancshares, Inc. ("Main Street") is a bank holding company with its principal offices located in Harrisburg, Illinois. Main Street is the sole shareholder of Grand Rivers.

4. Peoples National Bank, N.A. ("Peoples") is a national bank chartered and supervised by the Office of the Comptroller of the Currency. Peoples' principal offices are located in Mount Vernon, Illinois.

5. Market Street Bancshares, Inc. ("Market Street") is a bank holding company with its principal offices located in Mount Vernon, Illinois. Market Street is the sole shareholder of Peoples.

6. Frank William Bonan ("Bonan I") is an individual resident of Mount Vernon, Illinois. Bonan I is the Chairman, President, and General Counsel of Peoples and is the Vice Chairman of Market Street. Bonan I is the father of Frank William Bonan II and Katherine Bonan.

7. Frank William Bonan II ("Bonan II") is an individual resident of Harrisburg, Illinois. Bonan II is the former Chairman of Main Street and Grand Rivers and a current director of Market Street and Peoples. Bonan II also formerly served as Peoples' President of the Southern Illinois District. Bonan II also has ownership interests in Company #2 and Company #3. Prior to their dissolution, Bonan II had ownership interests in Company #1 and Company #5.

8. H. Keith Botsch ("Botsch") is an individual resident of Carmi, Illinois. Botsch is a former member of Grand Rivers' Executive Committee and performs accounting work for Grand Rivers. Botsch is a current director of Market Street and Peoples. Botsch served as President of Grand Rivers from August 2010, upon approval of the change in control, through October 2015. Botsch is a principal shareholder of Main Street.

9. Company #1 was an Illinois limited liability company with its principal offices in Carmi, Illinois, prior to its voluntary dissolution on May 31, 2016. Bonan II and Botsch were the Managers of Company #1.

10. Company #2 is an Illinois limited liability company with its principal offices in McLeansboro, Illinois. Bonan II is the Manager of Company #2.

11. Company #3 is an Illinois limited liability company with its principal office in Benton, Illinois. Bonan II and a Peoples insider are the Managers of Company #3.

12. Company #4 is an Illinois limited liability company with its principal office in McLeansboro, Illinois. Company #4 is managed by a Peoples insider.

13. Company #5 was an Illinois limited liability company with its principal offices in Benton, Illinois, prior to its involuntary dissolution on December 9, 2016. Bonan II was the registered agent for Company #5 and also served as the Manager, along with Jason Harbison, Grady Gaskins, Brandy Questelle, and DeeDee O'Bright.

14. Company #1, Company #2, Company #3, Company #4, and Company #5 are collectively referred to herein as the "Bonan II-Controlled Entities."

15. Joseph Hunt Bonan ("H. Bonan") is an individual resident of Mount Vernon, Illinois. H. Bonan is the Chairman and President of Market Street and the Vice President of Peoples. H. Bonan is Bonan II's uncle.

16. Grady Gaskins ("Gaskins") is an individual resident of Harrisburg, Illinois. Gaskins began serving as Chief Financial Officer of Grand Rivers on April 16, 2015 and purported to act as a director beginning on October 19, 2015. Gaskins was also a lender for Grand Rivers. Prior to his employment with Grand Rivers, Gaskins served as a loan officer at Peoples. Gaskins concurrently acted in a management capacity with Company #2.

## JURISDICTION & VENUE

17. This is an action arising in part under the laws of the United States, as Grand Rivers seeks relief under the Racketeer Influenced and Corrupt Organizations Act. 28 U.S.C. § 1961, *et seq*. ("RICO"). This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1965(a). Grand Rivers further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. § 1367.

18. Declaratory relief is authorized by Rule 57 of the Federal Rules of Civil Procedure and by 28 U.S.C. § 2201.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the Defendants reside in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

20. Since 2010, Peoples, Market Street, Bonan I, Bonan II, and Botsch have asserted control over and indirect ownership of Grand Rivers and Main Street without approval of the Board of Governors of the Federal Reserve System (the "Federal Reserve") and in violation of laws and bank regulations, and have operated Grand Rivers to its detriment for the primary benefit of Peoples and its individual insiders.

*Leadership Control of Grand Rivers*

21. The control of Main Street and Grand Rivers by Market Street and Peoples began in 2010, when two insiders of Peoples – Bonan II and Botsch – first constituted a majority of Grand Rivers' three-member Executive Committee.

22. The Executive Committee is responsible for approving all loans made by Grand Rivers.

23. Many of the loans made while Bonan II and Botsch were controlling members of the Executive Committee benefitted Market Street, Peoples, their insiders, Bonan II's family members and friends, or the Bonan II-Controlled Entities.

24. Bonan II and Botsch did not disclose the substandard nature of certain loan transactions to Main Street, Grand Rivers, or the sole independent member of the Grand Rivers Executive Committee; and when questions were raised as to the quality of these transactions, Bonan II exercised dominant control to further the scheme.

*Ownership Control of Main Street*

25. Market Street and Peoples have asserted control over and indirect ownership of Main Street and Grand Rivers without the approval of the Federal Reserve.

26. Market Street and Peoples violated Section 3 of the Bank Holding Company Act by acquiring control and indirect ownership of Grand Rivers without obtaining approval from Federal Bank Regulators. Any company has "control" over a bank or over any company if: (a) the company directly or indirectly or acting through one or more other persons owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company; (b) the company controls in any manner the election of a majority of the directors or trustees of the bank or company; or, (c) the Board determines, after notice and opportunity for

hearing, that the company directly or indirectly exercises a controlling influence over the management or policies of the bank or company. 12 U.S.C. § 1841(a)(2).

27. Market Street and Peoples control Main Street and Grand Rivers through the combined ownership interests of Bonan II and Botsch, who have the power to vote more than 25% of the voting securities in Main Street.

28. Market Street and Peoples indirectly own at least 35.14% of outstanding shares of Main Street stock.

29. Members of the Bonan family collectively own more than 25% of Market Street stock, and more than 10% of Main Street stock.

30. Botsch owns Market Street stock and is the largest shareholder of Main Street.

31. Bonan II inappropriately controlled the election of the majority of Directors of Main Street.

32. On October 21, 2015, Bonan II communicated to Whitney Stringer, the Chief Executive Officer of Grand Rivers, ("Stringer") via telephone a directive that the following occur within Grand Rivers: (a) everyone except one individual, Jake Campbell, resigns from the Board; (b) Bonan II is then able to choose his own Board of Directors; (c) Whitney Stringer becomes CEO of Grand Rivers; (d) Grady Gaskins becomes CFO of Grand Rivers; and (e) Bonan II receives ten thousand dollars ($10,000.00) per month as Chairman of the Board.

33. That same day, Bonan II followed up with emails to Stringer, listing the five individuals whom he demanded compose the Main Street and Grand Rivers' Boards: himself, Stringer, Gaskins, Jake Campbell, and Luke Phelps.

34. Stringer communicated Bonan II's demands to the former Board members via email.

35. The Board members whom Bonan II demanded resign acquiesced to Bonan II's demand and resigned.

36. Bonan II purported to serve as Chairman, but he was neither appointed nor elected as required by Illinois law or the Grand Rivers Bylaws.

37. As a result of the resignation of all Board members except Jake Campbell and Stringer, Grand Rivers was left with only two directors.

38. With only two directors, Grand Rivers was operating without a duly elected Board – a Board that was therefore not empowered to act on behalf of Grand Rivers.

39. Pursuant to Main Street's and Grand Rivers' Bylaws, it was then impossible to have a quorum of directors, unless new directors were formally appointed or elected by shareholders.

40. New directors were not appointed or elected in compliance with Main Street's and Grand Rivers' Bylaws or Illinois law.

*Capital Transfer to Market Street through Straw Borrowers*

41. On June 29, 2012, the Defendants engaged in an illegal transfer of capital from Grand Rivers to Market Street – the ultimate holding company of Grand Rivers – through the use of straw borrowers.

42. On June 29, 2012, at the direction of Bonan II, Grand Rivers extended three $490,000.00 loans to family members of a shareholder, director, and insider of Peoples. All three borrowers were in their twenties at the time the loans were extended, and none were customers of Grand Rivers.

43. Bonan II moved that the Executive Committee approve these loans – a motion that was seconded by Botsch.

44. Each loan was secured by 1,841 shares of Market Street common stock, pledged by the Peoples insider.

- The Commercial Pledge Agreement for the loan to the first family member lists a loan date of July 3, 2012 and describes the collateral as follows: "1,841 Shares of Market Street Bancshares, Inc. Stock Certificate No #XX5." Stock Certificate No. XX5 was issued to the Peoples insider on July 31, 2012.
- The Commercial Pledge Agreement for the loan to the second family member similarly lists a loan date of July 3, 2012 and describes the collateral as follows: "1,841 Shares of Market Street Bancshares, Inc. Stock Certificate No #XX6." Stock Certificate No. XX6 was issued to the Peoples insider on July 31, 2012.
- The Commercial Pledge Agreement for the loan to the third member similarly lists a loan date of July 3, 2012 and describes the collateral as follows: "1,841 Shares of Market Street Bancshares, Inc. Stock Certificate No #XX7." Stock Certificate No. 327 was issued to the Peoples insider on July 31, 2012.

Non-existent collateral was pledged on these loans. The collateral was acquired at a later date, and money was siphoned from Grand Rivers to increase the capital of Market Street, the ultimate holding company in the enterprise. The loan proceeds totaling $1,470,000.00 were paid from Grand Rivers to Market Street Bancshares Escrow Account (Account No. XXXXX620 at Peoples National Bank) via wire transfer on July 5, 2012. Upon information and belief, on August 9, 2012, Market Street and Peoples used these illegally obtained funds to repay money owed to the federal government under the Troubled Asset Relief Program (TARP).

*Loan Participations & Sales*

45. Market Street and Peoples have engaged in a coordinated effort to conceal low quality assets on their balance sheet through a series of loan participations and loan sales to Grand Rivers.

46. Based on the ownership and control exerted by Peoples over Grand Rivers, Grand Rivers is considered an "affiliate" of Peoples under federal banking law. *See* 12 C.F.R. § 223.2(3).

47. In general, a member bank may not purchase a low-quality asset from an affiliate unless, pursuant to an independent credit evaluation, the member bank had committed itself to purchase the asset before the time the asset was acquired by the affiliate. *See* 12 C.F.R. § 223.15(a); *see also* 12 C.F.R. § 223.1(c) and 12 U.S.C. § 1828(j) (provisions by which the FDIC makes 12 C.F.R. § 223.15(a) applicable to non-member banks, such as Grand Rivers)

48. Banking regulations generally prohibit a member bank from purchasing a low-quality asset from an affiliate unless, pursuant to an independent credit evaluation, the member bank had committed itself to purchase the asset before the time the asset was acquired by the affiliate. *See* 12 C.F.R. § 223.15(a).

49. What constitutes a "low-quality asset" is defined by the regulations to include, in part, an asset classified as "substandard," "doubtful," or "loss." 12 C.F.R. § 223.3(v).

50. Grand Rivers routinely purchased participation interests in loans from Peoples, its affiliate, some of which would constitute low-quality asset loans (the "Participation Loans").

51. The Participation Loans were approved by the Executive Committee at the request and direction of Bonan II.

52. Many of the Participation Loans met the "low-quality asset" standard and violate the prohibition against a member bank purchasing such assets from an affiliate.

53. The Participation Loans totaled approximately six million dollars ($6,000,000.00) prior to a partial repurchase by Peoples, and Grand Rivers expects to take losses on those that have not been repurchased.

54. The following transactions constitute examples of these Participation Loans:

- On April 29, 2013, Peoples originated a loan to two limited liability companies (the "LLCs") in the amount of $13,642,648.70. On the same date, Grand Rivers entered into a participation agreement with Peoples in the amount of $500,000.00. On July 26, 2013, Peoples Loan Officer Brian Frerichs emailed Bonan II, indicating that the owner of the LLCs was planning to sell his property in another state and wanted to restructure his credit with Peoples. The following conversation ensued:
    - Bonan II emailed Frerichs: "See if everyone will be ok with this. I know grcb would be ok with this so you just need to call farmers and the other bank."
    - Frerichs emailed Bonan II: "Everyone's ok with this, they just need to get their formal approvals. Should I send a memo to SLC now, or just wait to see if the sale really happens?"
    - Bonan II emailed Frerichs: "Ok That would be good How much of a fee with [sic] GRCB have, and what kind of fee. I will go ahead and get that approved."

- Frerichs emailed Bonan II: "GRCB would get $3,670 of the $100,000 fee, and their share of the balance would be $183,500."
- Bonan II emailed Grand Rivers Loan Officer Don Nave: "We are going to be paid down on the [LLCs] deal. There is a prepayment penalty. We need to approve this Friday the paydown with the prepayment penalty mentioned, a total of $3,670. We will have a remainder balance of $183,500. Let me know if you have any questions."

Bonan II and Botsch approved the transaction. This participation was ultimately paid off.

- On February 28, 2015, Grand Rivers entered into a Participation Agreement with Peoples as to a loan extended to a corporation. In late 2016, Tom Dolson, the CEO of Peoples, communicated to Stringer that Peoples wanted to extend the maturity date of the loan, explaining that, "depending on who you ask, this is a classified loan." A "classified" loan means that the loan was subject to adverse classification by regulatory authorities. As a result of such classification, Peoples requested that Grand Rivers sign a new agreement extending the maturity date of the loan, but the Board never voted on or approved doing so. Peoples went ahead and moved forward with a change in the terms of the loan anyway, extending the maturity by seven years. Pursuant to the terms of the Participation Agreement, "[u]nder no circumstances . . . shall [Peoples] extend the maturity date of the loan without consent of [Grand Rivers]." On February

7, 2017 Stringer sent a letter to Peoples demanding that they buy back the loan given the clear violation of the Participation Agreement. Peoples ignored this request. On March 3, 2017, Peoples counsel left a voicemail for Grand Rivers counsel indicating that they would likely repurchase the loan if the merger were to occur.

55. Because of credit issues, Peoples refused to repurchase some of the Participation Loans, and Peoples has violated its participation agreement with Grand Rivers on at least one occasion.

*Troubled Peoples-Related Loans*

56. Grand Rivers routinely served as a refinancing source for Peoples' loans that were considered low-quality assets, classified, or troubled loans, or loans that were experiencing credit weakness (the "Troubled Loans") to move the potential loan loss from Peoples' balance sheet to Grand Rivers'.

57. Peoples used its control of Grand Rivers to refinance troubled loans from Peoples to Grand Rivers to conceal a pattern of loan losses from federal bank regulators.

58. Bonan II and Botsch, acting on behalf of Peoples, used their position on the Grand Rivers Executive Committee to approve these Troubled Loans.

59. Bonan II, while acting as Chairman of Grand Rivers would routinely send emails from his Peoples email account directing Grand Rivers' then-CFO Gaskins to refinance Peoples loans at Grand Rivers and dictating the terms of those loans.

60. The following constitute examples of these emails:

- Email from Bonan II to Gaskins on August 6, 2015:

**From:** Bill Bonan II [mailto:Bill.BonanII@peoplesnationalbank.com]
**Sent:** Thursday, August 06, 2015 11:06 AM
**To:** Grady Gaskins <ggaskins@grandriverscommunitybank.com>
**Subject:** Plan

Here are the loans that I want to close. Then after this I want you to not do any more loans on the commercial side. We will let Mike close the rest of his pipeline which should get us to where we need to be

On [redacted] personal stock loan. I would say do another change in terms. Destroy the write up that you used to get her approval on the new loan amount using the stock as collateral. Then we can go back to using the evaluation and there for sure wont be any problems.

Do 2 years of interest only, with interest amount due on January of each of year for the full interest due each year. Don't charge any fees. I will get this signed. Then she should be set.

[redacted] The new dollar amount is around $400,000 We need to close this as soon as possible with the restructure that you and I spoke about. This is the most critical since he needs it quick

[redacted]: $750,000

[redacted]: $700,000

[redacted]: $1,350,000 You can give this to Mike if you wish

[redacted]: $400,000 doing the structure that we spoke about

This should be it. We have enough core income now to really make a nice profit between now and end of the year, so that will be good

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

- Email from Bonan II to Gaskins on July 27, 2015:

**From:** Bill Bonan II <Bill.BonanII@peoplesnationalbank.com>
**Sent:** Monday, July 27, 2015 12:45 PM
**To:** Grady Gaskins
**Subject:** RE: [redacted] loans

Here is what I think we should do.

[redacted] business is very seasonal. He actually gets paid really one time per year, that being right after Christmas. Explain that in the write up. He is very much like a farmer. He gets hit with all the expenses this year and then gets paid next year.

But if we took the

$642,340.28
$314,544.78
$125,938.45
Payoff Portion of PNB; $200,000 The only other debt that he would have besides this is a small balance of PNB of around $200,000 He will be able to pay that off this year for sure.
Working Capital: $150,000
Total: $1,432,823.51

Figure out what our legal lending limit is going to be. That should be really close. If we are a little off then we can carve a small piece of this and just lend to an LLC of his, but I would like to do it all together.

Look at this but I think the [redacted] properties all appraised for around $250,000 The [redacted] Property appraised for $3,000,000 Condo on [redacted], this is a condo at the [redacted]. It appraised for $415,000 Total Collateral value should be approx. $3,665,000

Check this but if that is write then that would give us an approx. LTV of 40%

I would structure like this

He will bring all interest current when we close this

Annual Payment on February 15th
3 year term 6.25
25 year amortization
Fee: $1500
All companies as borrowers, including him personally plus his personal guarantee. We need updated tax returns to do this and financial statement which I am hoping that [redacted] should have to me today or tomorrow

61. Peoples' officers and employees routinely directed and coordinated refinancing Troubled Loans from Peoples to Grand Rivers from their Peoples email addresses.

62. The Troubled Loans total approximately ten million dollars ($10,000,000.00) and were approved by the Executive Committee while it was controlled by Peoples' insiders. The Troubled Loans account for approximately 21% of Grand Rivers' entire loan portfolio.

63. The following transactions constitute examples of these Troubled Loans:

- Mike Williams, a Grand Rivers Loan Officer, reviewed the request for a loan from a corporation on or around March 2015, and upon analysis of the guarantors' personal financial statements and the projected cash flow from the corporation, saw weakness in the personal guarantees and marginal cash flow. Soon after, Grand Rivers Credit Analyst Don Nave advised Mr. Williams that "[Bonan II] says we have to make the loan." Mr. Williams received numerous phone calls from Amy Short, a Peoples loan department employee, regarding the status of the loan closing. The corporation was approved for a loan with Grand Rivers on March 17, 2015. On March 18, 2015 Candice Jones, a Commercial Account Manager with Grand Rivers submitted a request for loan approval to the Grand Rivers Executive Committee via email titled, "[Corporation] Change approval" stating, "[The loan] was closed on 03/17/2015. Lender was told by principals that PNB said for them to hold off on monthly payments until Grand Rivers was ready to refinance their loans at PNB. Lender requests approval of loan increase from $585,000 to $591,158 to cover accrued interest on loan at PNB. Also requesting 6 months interest only payments then to correct monthly P&l payments with a 7 year amortization. Let me know if you have any questions. Please reply with your responses. Thank you." On March 18, 2015, Bonan II and Botsch, on behalf of Grand Rivers, approved the loan via email. On March 19, 2015, a wire transfer in the amount of $605,849.61 was transmitted across state lines from Grand Rivers to a Peoples bank account at US Bank (St. Louis, Missouri) on behalf of the corporation to satisfy outstanding Peoples loans. On information and belief, during the closing, Bonan II indicated that the loan was being made by Grand

Rivers because Grand Rivers was a state bank with more lenient regulations than Peoples.

- A corporation obtained a series of commercial loans from Grand Rivers starting on March 31, 2011, to finance the construction and rehabilitation of residential properties (the "Rentals") for purposes of sale and rental. The corporation was also a customer of Peoples during this time period. Bonan II, acting through Company #2, agreed to purchase the Rentals in or around September 2015. On November 17, 2015 Gaskins sent an email to Patrick Hunn directing him to prepare paperwork required to facilitate the purchase of the Rentals by Bonan II from the corporation, acting through Company #2, for $1,700,000.

  The President of the corporation and her husband applied for a mortgage loan from Peoples, but were unable to borrow the entire amount of the purchase price of the home, as Peoples approved a mortgage for only 80% of the value of the home. Bonan II, in his capacity as an officer of Peoples, voted to approve the credit request. Bonan II instructed the President to apply with Grand Rivers for a $30,000 loan that would be secured by a thirty-day note using the Rentals as collateral to finance the down payment for their home purchase. Bonan II, in his capacity as an officer of Grand Rivers, voted to approve the $30,000 loan request in an email dated October 29, 2015 to Kassie Winters, the Head of Loan Operations at Grand Rivers.

  On February 4, 2016, Gaskins sent an email to Winters telling her to "remove all fees and late charges" on the twenty-one loans that the corporation had with Grand Rivers. Bonan II financed the purchase of the Rentals with a

commercial loan from Focus Bank in Charleston, Missouri. In an email dated March 16, 2016, Gaskins provides Bonan II with the HUD Settlement Statement for the loan with Focus Bank. Bonan II responds in an email to Gaskins and Lucy Dauby on March 16, 2015 stating, "I walk away with $7000. All properties are clear of any liens. The subordination agreements are all signed." The Rentals were already pledged as collateral for the $30,000 loan to the President. On March 29, 2016 Dauby, an employee at Kotner Title Company who was responsible for the closing of Bonan II's purchase of the Rentals, sent an email at the direction of Bonan II advising Winters to remove the $30,000 loan from the closing statement as a liability on the Rentals. On April 1, 4, and 6 of 2016, at Bonan II's request, Releases were filed on the Rentals, leaving Grand Rivers in an unsecured position on the $30,000 loan made to the President and approved by Bonan II in both his official capacity at Peoples, and at Grand Rivers.

- An individual borrower and his related entities (collectively, the "Borrower"), had personal and business loans with Peoples on and before 2011. The Borrower also had personal and business loans with Grand Rivers totaling approximately $1,090,978. Peoples restructured the credit with the Borrower in 2011 and made further restructuring efforts in 2013 and 2015. The Borrower continued to experience financial difficulty and the credit was downgraded again following an external loan review at Peoples in 2015. On July 24, 2015 Grand Rivers CEO Stringer advised Bonan II via email of loans identified in a recent loan review that should be downgraded. A Grand Rivers loan with the Borrower was recommended for downgrade. In an email to Stringer, Gaskins, Don Nave, and

Mike Williams from his Peoples email address, Bonan II responded, "For [him], we are restructuring all of his debts now. I am waiting on updated taxes and a financial statement from him now, so this will be cleaned up and made to look perfect also." Bonan II instructed Nave on August 12, 2015 to extend the Borrower credit whereby Grand Rivers would lend $1,395,893.00, pay $151,319.08 cash out, and refinance $150,000 of an existing Peoples loan – all of this effectively increasing Grand Rivers' exposure to the Borrower by over 1,263,537.90. Nave advised Bonan II by electronic mail on August 3, 2015 that the Borrower was continuing to experience cash flow issues and was a substandard credit risk. Bonan II responded to Nave in an electronic mail dated August 3, 2015 stating, "He is fine on cash flow. Because of the way he gets paid it is like a farmer. He had always made his payments as agreed and we have an excerpt [sic] his expenses in one year and the income in the next." Thereafter, Bonan II and Nave exchanged emails:

**From:** Bill Bonan II <Bill.BonanII@peoplesnationalbank.com>
**Sent:** Wednesday, August 12, 2015 9:17 AM
**To:** Don Nave
**Cc:** Grady Gaskins
**Subject:** Re: [redacted]

Are you asking if I give a shit Don. You have no idea what is going on. If you would like to know please let me know. You guys work on this loan or pack your shit and get out.

Sent from my iPhone

> On Aug 12, 2015, at 9:15 AM, Don Nave <dnave@grandriverscommunitybank.com> wrote:
>
> He is 77 and 41 days past due on his loans and has been downgraded to 4.
>
> -----Original Message-----
> From: Bill Bonan II [mailto:Bill.BonanII@peoplesnationalbank.com]
> Sent: Wednesday, August 12, 2015 9:13 AM
> To: Don Nave
> Cc: Grady Gaskins
> Subject: [redacted]
>
> Where do we stand on [redacted] loan
>
> Sent from my iPhone

That same day, Gaskins submitted the restructured loan for approval to the Executive Committee. The Executive Committee, controlled by Peoples insiders, approved the transaction. On May 26, 2016, when the annual loan payment on the loan was due, the Borrower could not be contacted. Grand Rivers threatened to foreclose on the loans in February 2016. On April 21, 2016 Bonan II contacted Stringer stating that the Borrower was a "good friend" of H. Bonan and Bonan I, and that by not "taking care of Peoples customers," Grand Rivers could jeopardize the planned merger with Peoples. Bonan II made similar calls to Loan Officer and Botsch on April 20, 2016. On April 21, 2016 Botsch told Stringer and Williams that Bonan II had contacted him and advised that the loan would be repaid within two weeks. The loan remains unpaid, and has caused Grand Rivers to suffer losses.

64. Peoples has used Grand Rivers as a dumping ground for risky, ill-advised, or low-quality loan transactions. These Troubled Loans were undertaken by Grand Rivers at the direction of Peoples insiders for the benefit of Peoples, as they addressed deteriorating loan quality conditions at Peoples and served to transfer Peoples' loans that were considered low-quality assets, classified, or troubled loans or that were experiencing credit weakness "off-balance sheet" to avoid regulatory scrutiny.

65. Throughout the process of their approval of these Troubled Loans, Bonan II and Botsch were nominally acting on behalf of Grand Rivers, but were in fact moving the Troubled Loans from Peoples' balance sheet to Grand Rivers.

66. To date, Grand Rivers has experienced losses from the Troubled Loans in the amount of $2,230,640.44.

*Golconda Property*

67. In 2015, Grand Rivers acquired a bank branch property in Golconda for $79,000.00 at the direction of Bonan II (the "Golconda Property").

68. Grand Rivers never intended to open a branch at the Golconda Property and never sought regulatory approval to do so. Grand Rivers would not have purchased the Golconda Property but for the actions Bonan II.

69. From his Peoples' email account on Bonan II directed the contractor who worked on Peoples' branches to begin remodeling the Golconda Property to suit the needs of Peoples and him personally.

70. At the time of purchase, the Golconda Property was capable of being used as a bank branch without further construction or renovation.

71. At the direction of Bonan II, Grand Rivers spent $155,872.44 in unnecessary renovation expenses to transform the Golconda Property into a Peoples branch.

72. As evidenced by numerous email communications, the Golconda Property was acquired for the benefit of Peoples, was intended to be a Peoples branch, and was controlled by Peoples. On October 7, 2015, Beth Williams, Chief Operating Office and Executive Vice President at Peoples, sent an email to Stringer requesting plans for the branch, indicating Peoples was considering an ATM at the Golconda Property. On January 26, 2016, Bonan II sent an email from this Peoples email account to Stringer: "We must finish Golconda. We can't stop that." Then on April 14, 2016, an email from Bonan I's assistant stated on behalf of Bonan I, "Tell them I said to stop Construction." On February 15, 2017, the president of a contractor for Golconda, met with Stringer to discuss payment on an outstanding invoice for Golconda. The president asked if Grand Rivers had any interest in moving into the Golconda market in the event

that the merger with PNB did not happen. He stated that since the proposal for Golconda was to make the branch into a PNB branch, there were several items that could be removed from the bid, which would lessen the cost of the project.

*Self-Dealing*

73. A review of numerous Grand Rivers loan files has revealed a pattern of extensive self-dealing involving Peoples insiders that has resulted in significant losses to Main Street and Grand Rivers.

74. As an executive officer of Grand Rivers, Bonan II has engaged in a pattern of self-dealing to benefit himself, his family members and friends, effectively using Grand Rivers as a personal account from which he could borrow unlimited amounts of money.

75. In an email to Gaskins and other unnamed co-conspirators from his Peoples email address on June 7, 2015, Bonan II identified a series of "projects" that had to be done. Bonan II concluded his email to the group by stating, "I need to get my gross income up to $250,000 per month very soon. We will go over cash flow so everyone will know how than [sic] contribute. Remember the deal. The more money the business makes the more money you guys make. I have always done this and will continue to do this."

76. The following transactions constitute examples of Bonan II's self-dealing to the detriment of Grand Rivers:

- Company #4, as of May 2015, was an Illinois limited liability company with a Peoples insider as its sole owner; and Company #3, was an Illinois limited liability company of which the Peoples insider and Bonan II are the managing members. In May 2015, Grand Rivers received a loan request from Company #4 in the amount of $592,500.00, for which the Peoples insider provided a personal

guaranty as collateral. The Executive Committee approved the loan in May 2015. The purpose of the loan was for Company #4 to purchase a parking lot in St. Louis, Missouri. The parking lot was adjacent to an apartment building owned by Company #3 and that Company #4 had entered into a lease agreement with Company #3, whereby lease revenue would be tied to occupancy of the apartment buildings. On May 14, 2015, a wire transfer in the amount of $592,500.00 was transmitted across state lines from Grand Rivers to US Bank (St. Louis, Missouri). On July 27, 2015, Bonan II directed that the Peoples insider be removed as a personal guarantor for this loan.

Contemporaneously to the removal of the Peoples insider as a personal guarantor for the Company #4 loan, Bonan II orchestrated a $1,325,000.00 loan to the Peoples insider. To obtain the loan, the Peoples insider pledged Market Street stock as collateral. Grand Rivers then-CFO Gaskins advised Bonan II on July 22, 2015 in an email: "Need to get a value or secure more bank stock for [Peoples insider] individually. We have currently 1725 shares Valued at 736,385. We need to come up to 1,325,000." Bonan II responded on July 24, 2015:

**From:** Bill Bonan II <Bill.BonanII@peoplesnationalbank.com>
**Sent:** Friday, July 24, 2015 6:08 PM
**To:** Grady Gaskins
**Subject:** Re: [redacted] Cash Flow
**Attachments:** image001.jpg; image001.jpg

For [redacted] narrative on the bank stock loan I want you to write in the following

Peoples Natoonal Bank has been able to grow this year to approx 1,040,000,000 in assets. Last year the bank made approx 13,500,000 in net income. This is after fully finding the banks ALLL The stock of Peoles National is held very closely between just a few families. Stock at the bank has been sold by stock holders since around 2000. The appraisal that is done on the stock each year really is for KSOP purposes. This year they put a value on the stock of 1.07 times book. After speaking with Bill Bonan Sr he had stated that the stock is so valuable that he believes being able to sale the stock to potential investors or to he or Hunt Bonan for 2 times book value on the stock is very very realistic. Therefore we have increased the value of [redacted] stock and have assigned a value of 1,400,000. Plus [redacted] has indicated that around 200,000 to 300,000 of this new money request should be paid back in the next 12 to 15 months for sure

Everything else looks fine. Get it out and let's everything approved. These are good loans

Sent from my iPhone

On July 27, 2015 the Grand Rivers Executive Committee approved a $1,325,000 line of credit to the Peoples insider. Bonan II abstained from the vote. Bonan II closed the transaction, and no Grand Rivers loan officer was present at the closing. Proceeds from an initial $725,000.00 draw on the line of credit were used to purchase an apartment building by Company #3. As a result of these transactions, Bonan II, through his interest in Company #3, obtained an economic benefit in violation of federal banking regulations at the expense of Grand Rivers.

- On February 28, 2014, Bonan II arranged, approved, and obtained a $300,000.00 loan through a straw borrower. The proceeds of this loan were used as a down payment on a building being purchased by Company #1, a company owned and controlled by Bonan II and Botsch. Company #1, on behalf of the straw borrower, made loan payments into a deposit account with Grand Rivers, and the payments were then applied to the straw borrower's loan. Bonan II, by agreement with the straw borrower, paid this loan off on August 19, 2014, when Bonan II refinanced

the debt at Bank of Marion. Correspondence from DeeDee O'Bright, Bonan II's personal bookkeeper, document Bonan II's role in the payoff of the loan:

- O'Bright emailed Taylor Long at Grand Rivers on August 6, 2014: "I am overnighting a check for the remaining balance that [Company #1] owes [the straw borrower]. That amount will not completely pay off the loan, but [Bonan II] has spoken to [the straw borrower] and he is aware of that."
- Long emailed O'Bright on August 8, 2014: "Good morning/afternoon DeeDee! I just received your check for [the straw borrower]. After these two checks, he will still owe $1,172.17. Do I need to call him to let him know this?"
- O'Bright emailed Long on August 8, 2014: "Taylor the check I sent is the remaining balance that [Company #1] owed [the straw borrower]. Bill told me he spoke to [him] about it and that any remaining balance would be his responsibility."

The loan file for this loan was never found. Bonan II obtained an economic benefit through the extension of credit made to his company through a straw borrower.

- At the direction of Bonan II, Grand Rivers extended loans to LLC #1 and Individual #1, the terms of which were dictated by Bonan II. The total amount of the credit extended to these borrowers was $1,312,000.00. The $1,262,000.00 loan to LLC #1 – a straw borrower – was guaranteed by two individuals with extremely limited financial capacity (one of which had a negative net worth) who were employed by Bonan II in his other activities. A portion – $358,309.12 – of

the proceeds of this loan was used to refinance a first mortgage loan owed by LLC #2 at Peoples, concealing and removing a struggling or low-quality asset from Peoples' books and transferring it to Grand Rivers. LLC #2 is an Illinois limited liability company. The two managing members of LLC #2 are personal friends of Bonan II, one of whom on information and belief Bonan II was engaged in a romantic relationship with at the time. Neither the debtor nor the guarantors had the capacity to service this debt, and Grand Rivers has been left with a bad loan that was extended for the benefit of Peoples, Bonan II, his friends and romantic interest.

The loan to the individual (one of the guarantors of the loan to LLC #1) in the amount of $50,215.00 was also arranged and approved by Bonan II. The individual – another straw borrower – was advised by Bonan II that Bonan II could not be the borrower because of his association with Grand Rivers, but that Bonan II would ensure that the loan was approved. As payments on the loan came due, Bonan II provided the straw borrower with money to make such payments. Upon information and belief, those loan proceeds were deposited to the individual's account, and $44,295.00 was subsequently transferred to Company #5, an entity of which Bonan II is a managing member and the agent of record. Upon further information and belief, this transaction financed a spec-home owned by Company #5, which received sales proceeds of $50,472.19 when property at 1212 South Webster Street, Harrisburg, Illinois was sold. Yet, only $30,000 was used to pay down the debt at Grand Rivers, leaving an unsecured balance of approximately $20,000 on a classified loan.

- On March 28, 2013, Bonan II arranged and approved a $137,500.00 loan from Grand Rivers to a director and employee of Peoples, who used the proceeds of the loan to purchase a home. Payments on the loan were made by Company #1 (an entity owned in part and controlled by Bonan II), and checks for the payments were signed by Bonan II, who was Chairman of the Grand Rivers Board of Directors at the time. On February 19, 2016, the loan was paid in full via an interstate wire originating from Focus Bank in Charleston, Missouri.
- On January 23, 2013 Grand Rivers extended a loan to two LLC's in the amount of $490,000, secured by commercial guarantees and a commercial security agreement listing oil drilling equipment as collateral (the "Collateral"). The first LLC is an Illinois limited liability company of which two of Bonan II's friends are the managing members. On information and belief Bonan II had a romantic relationship with one of such individuals that began prior to October 2015. On information and belief Botsch provided accounting services to this LLC. The second LLC was an Illinois limited liability company of which two of Bonan II's friends were the managing members. This LLC was involuntarily dissolved by the Illinois Secretary of State on June 13, 2014. Botsch was this LLC's registered agent, and on information and belief also provided it with accounting services. On June 27, 2013 Grand Rivers extended a second loan to the same two LLC's in the amount of $89,000. On May 8, 2014 Grand Rivers refinanced these two existing loans into a single loan in the amount of $640,500, secured by the Collateral. Peoples also held an interest in the Collateral. On or about October 9, 2015, without Grand River's knowledge or consent, the first of the two LLC's sold its

ownership interest in the Collateral to "Purchaser" representing the equipment to be "free and clear" of any encumbrances or liens. On October 9, 2015 a Bonan II friend with whom he was believed to be romantically involved, e-mailed Bonan II:

**From:** [redacted]
**To:** "Fifty" <Bill.BonanII@peoplesnationalbank.com>
**Subject: UCC-1 release**

Good morning,

We are needing a UCC-1 release from Grand Rivers and Peoples on Rig [redacted] to attach to the purchase agreement as Exhibit C. If at all possible, can we please get this done today?

Thanks,

[redacted]

Sent from my iPhone

Bonan II then had the following e-mail exchange with Gaskins:

| | |
|---|---|
| **From:** | Bill Bonan II <Bill.BonanII@peoplesnationalbank.com> |
| **Sent:** | Friday, October 09, 2015 5:20 PM |
| **To:** | Grady Gaskins |
| **Subject:** | Re: UCC-1 release |

She said she just emailed you

Sent from my iPhone

> On Oct 9, 2015, at 5:16 PM, Grady Gaskins <ggaskins@grandriverscommunitybank.com> wrote:
>
> Our ucc-1 is not a blanket it is just on this specific rig, so all I need to do is prepare the termination and I can send out. I won't file it until payment is received. Just need the attachments to confirm its same equipment and same wording in ucc and purchase agreement. I can take care of it right now.
>
> Sent from my iPhone
>
>> On Oct 9, 2015, at 5:01 PM, Bill Bonan II <Bill.BonanII@peoplesnationalbank.com> wrote:
>>
>> Get these releases to [redacted]
>>
>> Sent from my iPhone

On October 16, 2015 Bonan II sent Gaskins a follow up e-mail:

**From:** Bill Bonan II <Bill.BonanII@peoplesnationalbank.com>
**Sent:** Friday, October 16, 2015 8:44 AM
**To:** Grady Gaskins
**Subject:** Give me a call

Has to do with [redacted] release

Sent from my iPhone

On November 11, 2015 an employee of the LLC sent an e-mail to the Purchaser's employee stating, "All components of rig [X] have left LLC #1's yard and is now in possession of Purchaser. Per our agreement now that this is completed it is your responsibility to contact the escrow agents to release the remaining 10% of funds to the LLC #1." In response Purchaser advised the LLC's employee that they would require Peoples Bank and Grand Rivers Bank to file a UCC-1 Release prior to returning any funds left in escrow. On November 13, 2015 an LLC employee sent an e-mail to Bonan II stating:

From: [redacted]
Date: November 13, 2015 at 11:00:54 AM CST
To: "Bill.bonanii@peoplesnationalbank.com<mailto:Bill.bonanii@peoplesnationalbank.com>" <Bill.bonanii@peoplesnationalbank.com<mailto:Bill.bonanii@peoplesnationalbank.com>>, Scott Collins <Scott.Collins@peoplesnationalbank.com<mailto:Scott.Collins@peoplesnationalbank.com>>
Subject: FW: Rig Loads Completed

Bill –

[redacted] wants to know how we handle the UCC-1 from Grand Rivers. Even though there is no collateral for rig [redacted] at Grand Rivers [redacted] still wants a recorded UCC-1, does someone at Grand Rivers have this to send to me? I don't have anyone's information there to contact regarding this.

Thanks,
[redacted]

In response to the request, Bonan II ordered the Gaskins and Grand River's employee Kassie Winters to file a release of the Collateral in an e-mail:

**From:** Bill Bonan II <Bill.BonanII@peoplesnationalbank.com>
**Sent:** Friday, November 13, 2015 11:02 AM
**To:** Grady Gaskins; [redacted]; Kassie Winters
**Subject:** Fwd: Rig Loads Completed

Kassie/Grady Get this bulkshit done this morning. Do both of you understand me

Sent from my iPhone

As a result of Bonan II's order to release the Collateral to obtain an economic benefit for his friend and believed romantic interest, Grand Rivers was left in an unsecured position on an over $500,000 credit. Upon realizing their unsecured interest, Grand Rivers demanded that the LLCs execute a change in terms agreement on March 8, 2016 to obtain a blanket UCC security filing. Upon doing so Grand Rivers learned that Peoples had asserted a superior lien interest in the Collateral. This credit has since defaulted, and Grand Rivers has suffered a substantial loss.

77. The following transactions constitute examples of Botsch's self-dealing to the detriment of Grand Rivers:

- On September 4, 2015 Botsch directed Grand Rivers to close three loans to an LLC: (1) a loan in the amount of $74,383.41 to purchase a truck and a pickup from Company A; (2) a loan in the amount of $178,085.00 to purchase equipment from Company B; and (3) a loan in the amount of $102,500 as a line of credit facility to start a business. At Botsch's request, all three loans closed at the offices of Botsch & Associates CPA on September 4, 2015. Upon information and belief, Botsch led Grand Rivers Senior Loan Officer Mike Williams to believe that Company A was owned by Company B. Botsch did not disclose to Grand Rivers that he was the registered agent for and a managing member of Company A. The

cancelled check to Company A shows an endorsement stamped as follows: Peoples National Bank, NA, Botsch Associates CPAs, *****735. To date, Grand Rivers has charged off $935.31 on Loan #1; $48,326.77 on Loan #2; and $101,673.23 on Loan #3. Grand Rivers has had to post additional reserves to account for these losses.

- At the direction of Botsch, an LLC applied for a commercial loan from Grand Rivers in the amount of $160,014.00 to purchase property. One of the LLC's two managers requested and personally guaranteed the loan. The Grand Rivers Executive Committee approved the application on August 19, 2015, with Botsch indicating via an email to Senior Loan Officer Mike Williams, "I'm fine with this." A later review of the loan file and corporate organizational documents of the LLC revealed that Botsch organized the LLC, acts as its Resident Agent, and is its only other manager. The Operating Agreement provided by the LLC in connection with the request indicated that the Manager and another individual each owned a 50% interest in the LLC; however, upon information and belief, that Operating Agreement was fraudulent. The other individual is employed by Botsch & Associates CPA. Upon information and belief, Botsch owns 50% of the LLC, and he failed to disclose this ownership interest when the Grand Rivers Executive Committee – of which he and Bonan II represent a majority – approved the loan. The loan was repaid on August 12, 2016, from proceeds received from First Mid Illinois Bank. The proceeds check received by Grand Rivers referenced another LLC. The certificate of good standing for that LLC shows Botsch as its Registered Agent and Managing Member.

- On August 17, 2015 Botsch e-mailed Grand Rivers Senior Loan Officer Mike Williams, "Mike. [An individual] needs to borrow $60,000 for a 850J Dozer. Can you work on this for him? I own the dozer because he wanted to buy it at an auction but he is the one who has the info about the dozer. I just got involved because he had to have the money that day and all I did was loan it to him. Thanks. Keith." On August 21, 2015 Williams emailed Botsch: "I closed with [the individual] on the crawler dozer. What do we need to do with the $60,000?" Botsch responded that same day: "Just make the check out to Botsch Farms and bring it to the meeting Monday." The loan was paid in full on September 15, 2015 when it was restructured into another loan. It was later discovered that the individual borrower is related to Botsch.

- Bonan II instructed Gaskins to make two loans to a Grand Rivers employee with whom Bonan II is believed to have had a personal relationship. Bonan II sent the following email to Gaskins on July 4, 2014:

> On Jul 4, 2015, at 1:09 PM, Bill Bonan II <Bill.BonanII@peoplesnationalbank.com> wrote:
>
> Schedule this to close this Friday. You can appraisal from Dave early
> this week
> 2 loans
>
> Estimates
> Commercial unsecured loan. 45,000
> 3 year term. 5.79 250 fee that we finance. Put second mortgage on house as an abundance
> That 45,000 should be broken down as follows. Verify these numbers on Monday
> Michael. 10,000
> Credit cards 6,000
> Early payoff. 8,000
> Down Payment 16,000
> Furniture/fix ups 5,000
> Total 45,000. All yearly interest due on January 15th for the entire
> year. Just or interest only Payment
>
>
> Home loan
> 62,000
>
>
> Sent from my iPhone

Bonan II directed that Grand Rivers extend a $62,000 loan to purchase a home. The purchase price was $78,000, and thus the loan had an LTV of approximately 80%. The structure that Bonan II outlined above would be the unsecured loan, which would pay down the debt and act as the down payment for the purchase of the home.

Gaskins, as CFO and a lender for Grand Rivers, drafted the credit analysis and loan narrative, which he emailed to Bonan II on July 6, 2015. Both loans were sent to the Grand Rivers Executive Committee for approval on July 8, 2015. Bonan II and Botsch voted yes on both loans. Botsch then emailed the Executive Committee on July 9, 2015:

**From:** H Keith Botsch, CPA <cpa@botsch.com>
**Sent:** Thursday, July 09, 2015 8:34 AM
**To:** Candice Jones; 'Bill Bonan II'; 'Brent Clark'; Don Nave; Grady Gaskins; Mike Williams; Whitney Stringer
**Subject:** RE: [redacted] Approval

Everyone

One of the things I do every night is review the loans hat go out and take a closer more relaxed look at the write ups. Yesterday I voted yes on [redacted] loans. In reflecting on this I'm ok with the 1st on the real estate loan but I have issues with the unsecured loan to an employee with a 3 year lock rate. I need to change my vote on the unsecured loan to **NO**.

Sorry I caused confusion but I think the examiners will criticize us on this one.

Keith

Gaskins then revised the unsecured loan to be a $25,000 unsecured loan and presented the home loan with the $25,000 unsecured loan. Bonan II and Botsch again voted yes on both loans, which then closed and have since been classified. A $12,000.00 impairment has been made to the unsecured loan in Grand Rivers' allowance for loan and lease losses.

*Grand Rivers' Board of Directors*

78. Bonan II and Peoples exerted control over Main Street and Grand Rivers through its Board of Directors, demanding actions that were detrimental to Main Street and Grand Rivers in violation of law and Main Street's and Grand Rivers' Bylaws.

79. On October 19, 2015, the Boards of Directors of Main Street and Grand Rivers were fixed at ten members. Main Street's and Grand Rivers' bylaws provide that a proper quorum of the Board of Directors requires a majority of the fixed number of directors, therefore requiring six directors to achieve a proper quorum of the Board of Directors.

80. On October 19, 2015, Main Street – under the control and direction of Bonan II and Peoples – attempted to change the composition of Grand Rivers' Board of Directors, but did not follow the requirements outlined in Main Street's and Grand Rivers' Bylaws or Illinois law to legally effect the change.

81. Bonan II resigned from the Board on October 20, 2015, after which time he could not rejoin the Board, pursuant to Grand Rivers' Bylaws and Illinois law, unless he was elected by the shareholders or formally appointed by the Board to fill a vacancy – neither of which occurred.

82. On October 21, 2015, Bonan II demanded that the following occur within Grand Rivers: (a) everyone except one individual, Jake Campbell, resigns from the Board; (b) Bonan II is then able to choose his own Board of Directors; (c) Whitney Stringer becomes CEO of Grand Rivers; (d) Grady Gaskins becomes CFO of Grand Rivers; and (e) Bonan II receives ten thousand dollars ($10,000.00) per month as Chairman of the Board.

83. These actions failed to satisfy the requirements of Illinois law or the Grand Rivers Bylaws to properly constitute the Board.

84. As a result of Bonan II's demand and the resignation of all Board members except Jake Campbell and Whitney Stringer, Main Street and Grand Rivers was left with only two directors.

85. Purporting to take action by a complete, five-member Board, Main Street and Grand Rivers were operating without a duly constituted Board – a Board that was therefore not empowered to act on behalf of Main Street or Grand Rivers.

86. Pursuant to Main Street's and Grand Rivers' Bylaws and Illinois law, it was then impossible to have a quorum of directors, unless new directors were formally appointed or elected by shareholders.

87. New directors were not appointed or elected in compliance with Grand Rivers' Bylaws or Illinois law.

88. Bonan II's control of Main Street and Grand Rivers through Main Street's and Grand Rivers' Board of Directors was in part an effort to push through and consummate a merger agreement between Market Street, Peoples, Main Street, and Grand Rivers (together with subsequent amendments, the "Merger Agreement").

89. As a result of Bonan II's unsuccessful efforts to reconstitute the Board, the Board could not have properly and lawfully approved the Merger Agreement after the resignations in October 2015.

*The Merger Agreement*

90. Upon information and belief, on or about July 12, 2015, Botsch contacted Bonan I regarding Botsch's knowledge of Bonan II's improper activities related to Grand Rivers, and expressed in words or substance that, unless Bonan I were to do something about it, Bonan II would go to prison.

91. On August 20, 2015, Gaskins sent an email to Bonan II at his Peoples email address with the subject "PLAN" that outlined the intended terms of the acquisition of Grand Rivers by Market Street and Peoples.

92. On August 24, 2015, Market Street, at the direction of Bonan I, its Chairman, entered into a Letter of Intent to acquire the outstanding stock of Grand Rivers. Bonan II executed the Letter of Intent on behalf of Grand Rivers in an effort to conceal rampant self-dealing, preferential transactions, and the improper transfer of low-quality assets from Peoples to Grand Rivers.

93. On October 20, 2015, Bonan II abruptly resigned from the Grand Rivers Board of Directors.

94. At the time of Bonan II's resignation, Grand Rivers had no knowledge of the self-dealing, preferential transactions, and transfer of low-quality assets, and viewed the forthcoming merger with Peoples as a favorable transaction.

95. One day after his resignation, in a telephone conversation with Stringer, Bonan II advised that he would consider reinstating himself as Chairman of the Board to get the Merger back on track; however he also advised that Stringer would need to call Bonan I to determine whether Market Street would go forward with the Merger.

96. On October 21, 2015, Bonan I confirmed that Market Street would consider going forward with the Merger if Stringer spoke to Botsch about resigning from the Grand Rivers Board.

97. That same day, Bonan II advised Stringer that, in order for the Merger to proceed, the following conditions must be met at Grand Rivers: (a) everyone except one individual, Jake Campbell, resigns from the Board; (b) Bonan II is then able to choose his own Board of

Directors; (c) Whitney Stringer becomes CEO; (d) Grady Gaskins becomes CFO; and (e) Bonan II receives ten thousand dollars ($10,000.00) per month as Chairman of the Board. When Bonan II made this demand mid-day on October 21, 2015, he stated that his conditions must be satisfied by 4:00 p.m. that afternoon.

98. Because Main Street and Grand Rivers was unaware of the self-dealing, preferential transactions, and transfer of low-quality assets, and desired to go forward with the Merger, Main Street and Grand Rivers acquiesced to Bonan II's demands.

99. Peoples and Market Street purported to enter into the Merger Agreement with Main Street and Grand Rivers on November 27, 2015.

100. Peoples, Bonan II, Botsch, Gaskins, and other co-conspirators did not disclose the ongoing pattern of self-dealing, preferential transactions, and improper transfer of low-quality assets to Main Street and Grand Rivers.

101. Peoples, Bonan I, Bonan II, and Botsch fraudulently concealed the true purpose of the Merger Agreement.

102. As a result of Peoples', Bonan I's, Bonan II's, and Botsch's fraudulent concealment of the true purpose of the Agreement, the Merger Agreement is based entirely on fraud and is void.

103. As a result of Peoples', Bonan I's, Bonan II's, and Botsch's fraudulent concealment of self-dealing, preferential transactions, and improper transfer of low-quality assets in the formation of the Merger Agreement, the Merger Agreement is void.

104. As a result of Peoples', Bonan I's, Bonan II's, and Botsch's control of Grand Rivers, and their actions with regard to its Board, the Merger Agreement is void.

105. Because of Market Street's and Peoples' control of Grand Rivers, Market Street and Peoples effectively negotiated the Merger Agreement with themselves and their insiders – not between Peoples and Grand Rivers.

106. Furthermore, Main Street's and Grand Rivers' unduly constituted Board attempted to approve the Merger Agreement, acting at the direction of Market Street and Peoples insiders who were attempting to conceal self-dealing, preferential transactions, and the improper transfer of low-quality assets.

107. As the extent of self-dealing, preferential transactions, and the improper transfer of low-quality assets became apparent and Grand Rivers losses began to mount, the following email exchange occurred between Stringer and Bonan II on February 16, 2016:

**From:** Bill Bonan II <Bill.BonanII@peoplesnationalbank.com>
**Sent:** Tuesday, February 16, 2016 7:08 PM
**To:** Whitney Stringer
**Cc:** Mike Williams; Grady Gaskins
**Subject:** Re: Asset Quality
**Attachments:** image001.jpg

Don't ever think that this merger is not going to happen.

Sent from my iPhone

On Feb 16, 2016, at 4:20 PM, Whitney Stringer
<wstringer@grandriverscommunitybank.com<mailto:wstringer@grandriverscommunitybank.com>> wrote:

Attached is the list of loans that the examiners plan to downgrade. This puts us at 100% classifieds to capital.

Whitney R. Stringer,
Chief Executive Officer
Grand Rivers Community Bank
P. O. Box 763
Harrisburg, IL 62946
Phone: 618-294-8686 Ext. 5009
<image001.jpg>

108. On November 27, 2015, the Merger Agreement was signed by Bonan II, purportedly on behalf of Main Street; however, Bonan II lacked any corporate authority, given the unduly constituted Board.

109. The Merger Agreement is void *ab initio* because it was the product of fraud in the form of the concealment of self-dealing, preferential transactions, and the improper transfer of low-quality assets.

110. Alternatively, the Merger Agreement is voidable because, at the time Bonan II executed it, he had no actual or legal authority to act on behalf of Main Street and Grand Rivers.

111. Bonan II's resignation from the Board in October 2015 rendered him ineligible under the Bylaws to rejoin the Board unless elected by the shareholders or formally appointed by the Board to fill a vacancy – neither of which occurred.

112. When Bonan II executed the Merger Agreement on behalf of Main Street, he was no longer a member of the Board, and it is unclear under what purported power Bonan II acted, as he was neither an officer nor a director of Main Street at the time the Merger Agreement was executed.

113. Even if Bonan II had been a director, directors do not have the authority to sign contracts on behalf of Main Street under its Bylaws, its Articles, or Illinois law.

114. The Board did not take proper action with respect to the Merger Agreement, nor did the Board provide Bonan II with the requisite authority.

115. Additionally, Grand River's outside counsel did not seek a fairness opinion on the terms of the Agreement, did not include a disclosure schedule, and failed to properly advise shareholders of dissenters' rights.

116. The absence of the most fundamental elements typically seen in a transaction of this nature – such as a fairness opinion and a disclosure schedule – was not identified until Grand Rivers obtained independent counsel.

117. Market Street, Peoples and their insiders structured the Merger Agreement to be little more than an affiliate transaction, as evidenced by the conflicts of interest, improper and incomplete board action, and blatant one-sidedness of the Agreement.

**COUNT I: CIVIL RICO**

*Use of a Pattern of Racketeering Activity to Acquire or Maintain Control over an Enterprise*
*(18 U.S.C. § 1962(b))*
*[Claim Against All Defendants]*

118. The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

119. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

120. Each Defendant violated 18 U.S.C. § 1962(b) by the acts described in the prior paragraphs, and as further described below.

121. The Enterprise. Main Street and Grand Rivers form an association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4). While Main Street and Grand Rivers are legitimate businesses separate and apart from the pattern of racketeering, the Defendants – through their continuing pattern of racketeering activity set forth herein – infiltrated Main Street and Grand Rivers, associated with them, and managed them for their own illegal purpose.

122. The Enterprise has engaged in, and their activities have affected, interstate commerce.

123. Pattern of Racketeering Activity. Defendants, each of whom are persons associated with, or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and 1961(5) and 1962. The racketeering activity was made possible by Defendants regular and repeated use of the facilities and services of the enterprise. The Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

124. Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts, or aided and abetted such acts.

125. The acts of racketeering were not isolated, but rather the acts of the Defendants were related in that they had the same purpose and result, participants, victims and methods of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during the period of time beginning in August 2010 and continuing to the present, and there is a continued threat of repetition of such conduct.

126. Predicate Act: Use of Mails and Wires to Defraud Grand Rivers in Violation of 18 U.S.C. § 1341 and 1343. Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain money or property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. For the purpose of effecting their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. Mail or by private or commercial carriers, or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various

writings, signs, and signals. The acts of the Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

127. Predicate Act: Bank Fraud in Violation of 18 U.S.C. § 1344. Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1344 in that they in that they devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain moneys, funds, credits, assets, securities, and other property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. Plaintiffs reasonably and justifiably relied upon Defendants' false representations, false pretenses and deceptive communications, and Plaintiffs have been damaged as a direct and proximate result of Defendants participation in such enterprise as alleged herein.

128. Predicate Act: Extortion in Violation of 18 U.S.C. § 1951. Bonan II, Peoples, and Market Street committed an act constituting an indictable offense under 18 U.S.C. § 1951 in that they obtained interest and control in the Main Street and Grand Rivers Board of Directors by placing existing Board members in fear that a proposed merger with Market Street and Peoples would not occur unless the members consented to Bonan II's demands by 4:00 p.m. on October 21, 2015. At the time, Main Street and Grand Rivers viewed the proposed merger as an extremely favorable transaction.

129. Continuity of Conduct. Defendants violations of state and federal law as set forth herein, each of which have directly and proximately injured Plaintiffs and other market participants, constituted a continuous course of conduct spanning a period from approximately 2010 to present, which was intended to obtain moneys, funds, credits, assets, securities, and other

property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961 (1), (5).

130. Upon information and belief, Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(b).

## COUNT II: CIVIL RICO

*Conduct or Participation in the Affairs of an Enterprise through a Pattern of Racketeering Activity (18 U.S.C. § 1962(c))*
*[Claim Against All Defendants]*

131. The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

132. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

133. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

134. The Enterprise. Defendants Market Street, Peoples, Bonan I, and Bonan II, together with the Bonan II-Controlled Entities, form an association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. There may be other members of the Enterprise that are unknown at this time.

135. Alternatively, the Bonan-Controlled Entities each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

136. Alternatively, the Bonan-Controlled Entities together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

137. The Enterprise has engaged in, and their activities have affected, interstate commerce.

138. Pattern of Racketeering Activity. Defendants, each of whom are persons associated with, or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and 1961(5) and 1962. The racketeering activity was made possible by the Defendants' regular and repeated use of the facilities and services of the enterprise. The Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

139. Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts, or aided and abetted such acts.

140. The acts of racketeering were not isolated, but rather the acts of the Defendants were related in that they had the same purpose and result, participants, victims and methods of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during the period of time beginning in August 2010 and continuing to the present, and there is a continued threat of repetition of such conduct.

141. The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond racketeering activity. Rather they existed separate and apart from the pattern of racketeering activity for, in some instances,

legitimate business purposes. Market Street and Peoples have had and do have, upon information and belief, legitimate business plans outside of the pattern of racketeering activity.

142. Plaintiffs specifically allege that the Defendants participated in the operation and management of the association-in-fact enterprise and the alternative-enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

143. Predicate Act: Use of Mails and Wires to Defraud Grand Rivers in Violation of 18 U.S.C. § 1341 and 1343. Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain money or property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. For the purpose of effecting their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. Mail or by private or commercial carriers, or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals. The acts of the Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

144. Predicate Act: Bank Fraud in Violation of 18 U.S.C. § 1344. Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1344 in that they in that they devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain moneys, funds, credits, assets, securities, and other property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. Plaintiffs reasonably and justifiably relied upon the Defendants' false representations, false pretenses and deceptive communications, and

Plaintiffs have been damaged as a direct and proximate result of the Defendants' participation in such enterprise as alleged herein.

145. Continuity of Conduct. Defendants violations of state and federal law as set forth herein, each of which have directly and proximately injured Plaintiffs and other market participants, constituted a continuous course of conduct spanning a period from approximately 2010 to present, which was intended to obtain moneys, funds, credits, assets, securities, and other property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961 (1), (5).

146. Upon information and belief, Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

## COUNT III: CIVIL RICO

*Conduct or Participation in the Affairs of an Enterprise through a Pattern of Racketeering Activity (18 U.S.C. § 1962(c))*
*[Claim Against All Defendants]*

147. The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

148. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

149. Each Defendant violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

150. The Enterprise. Main Street and Grand Rivers form an association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4). While Main Street and Grand Rivers are legitimate businesses

separate and apart from the pattern of racketeering, the Defendants – through their continuing pattern of racketeering activity set forth herein – infiltrated Main Street and Grand Rivers, associated with them, and managed them for their own illegal purpose.

151. The Enterprise has engaged in, and their activities have affected, interstate commerce.

152. Pattern of Racketeering Activity. Defendants, each of whom are persons associated with, or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and 1961(5) and 1962. The racketeering activity was made possible by Defendants regular and repeated use of the facilities and services of the enterprise. The Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

153. Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts, or aided and abetted such acts.

154. The acts of racketeering were not isolated, but rather the acts of the Defendants were related in that they had the same purpose and result, participants, victims and methods of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during the period of time beginning in August 2010 and continuing to the present, and there is a continued threat of repetition of such conduct.

155. Predicate Act: Use of Mails and Wires to Defraud Grand Rivers in Violation of 18 U.S.C. § 1341 and 1343. Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to

defraud Grand Rivers or to obtain money or property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. For the purpose of effecting their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. Mail or by private or commercial carriers, or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals. The acts of the Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendant's scheme or artifice.

156. Predicate Act: Bank Fraud in Violation of 18 U.S.C. § 1344. Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1344 in that they in that they devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain moneys, funds, credits, assets, securities, and other property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. Plaintiffs reasonably and justifiably relied upon the Defendants' false representations, false pretenses and deceptive communications, and Plaintiffs have been damaged as a direct and proximate result of the Defendants' participation in such enterprise as alleged herein.

157. Continuity of Conduct. Defendants violations of state and federal law as set forth herein, each of which have directly and proximately injured Plaintiffs and other market participants, constituted a continuous course of conduct spanning a period from approximately 2010 to present, which was intended to obtain moneys, funds, credits, assets, securities, and other property through false representations, fraud, deceit, and other improper and unlawful means.

Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961 (1), (5).

Upon information and belief, Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

## COUNT IV: CIVIL RICO

*Use of Income Derived from a Pattern of Racketeering Activity in the Operation of*
*(18 U.S.C. § 1962(a))*
*[Claim Against All Defendants]*

158. The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

159. The Defendants violated RICO and Plaintiffs were injured as a result.

160. Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

161. Each Defendant violated 18 U.S.C. § 1962(a) by the acts described in the prior paragraphs, and as further described below.

162. The Enterprise. Defendants Market Street, Peoples, Bonan I, and Bonan II, together with the Bonan-Controlled Entities, form an association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § b1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. There may be other members of the Enterprise that are unknown at this time.

163. Alternatively, the Bonan-Controlled Entities each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4).

164. Alternatively, the Bonan-Controlled Entities together constitute an enterprise within the meaning of 18 U.S.C. § 1961(4).

165. The Enterprise has engaged in, and their activities have affected, interstate commerce.

166. Pattern of Racketeering Activity. Defendants, each of whom are persons associated with, or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), (5) and 1962. The racketeering activity was made possible by Defendants regular and repeated use of the facilities and services of the enterprise. The Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

167. Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Defendants each committed at least two such acts, or aided and abetted such acts.

168. The acts of racketeering were not isolated, but rather the acts of the Defendants were related in that they had the same purpose and result, participants, victims and methods of commission. Further, the acts of racketeering by Defendants have been continuous. There was repeated conduct during the period of time beginning in August 2010 and continuing to the present, and there is a continued threat of repetition of such conduct.

169. The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond racketeering activity. Rather they existed separate and apart from the pattern of racketeering activity for, in some instances, legitimate business purposes. Market Street and Peoples have had and do have, upon information and belief, legitimate business plans outside of the pattern of racketeering activity.

170. Plaintiffs specifically allege that the Defendants participated in the operation and management of the association-in-fact enterprise and the alternative-enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

171. Predicate Act: Use of Mails and Wires to Defraud Grand Rivers in Violation of 18 U.S.C. § 1341 and 1343. Defendants committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain money or property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. For the purpose of effecting their scheme or artifice, Defendants caused delivery of various documents and things by the U.S. Mail or by private or commercial carriers, or received such therefrom. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals. The acts of the Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance the Defendants' scheme or artifice.

172. Predicate Act: Bank Fraud in Violation of 18 U.S.C. § 1344. Defendants committed acts constituting indictable offenses under 18 U.S.C. § 1344 in that they in that they devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain moneys, funds, credits, assets, securities, and other property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. Plaintiffs reasonably and justifiably relied upon Defendants' false representations, false pretenses and deceptive communications, and

Plaintiffs have been damaged as a direct and proximate result of Defendants' participation in such enterprise as alleged herein.

173. The predicate acts alleged herein are set forth above and relate to leadership control of Grand Rivers, ownership control of Main Street, transfer of capital, loan participations and sales, troubled Peoples-related loans, the Golconda Property, a pattern of extensive self-dealing, the Grand Rivers Board of Directors, and the Merger Agreement.

174. Continuity of Conduct. Defendants violations of state and federal law as set forth herein, each of which have directly and proximately injured Plaintiffs and other market participants, constituted a continuous course of conduct spanning a period from approximately 2010 to present, which was intended to obtain moneys, funds, credits, assets, securities, and other property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961 (1), (5).

175. Upon information and belief, Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(a).

**COUNT V: CIVIL RICO**
*Conspiracy to Violate RICO (18 U.S.C. § 1962(d))*
*[Claim Against All Defendants]*

176. The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

177. In violation of 18 U.S.C. § 1962(d), the Defendants knowingly, willfully and unlawfully conspired to facilitate a scheme which included the operation or management of a

RICO enterprise through a pattern of racketeering activity as alleged in Paragraphs 118 through 175 above.

178. The conspiracy commenced at least as early as 2010 and is ongoing.

179. The conspiracy's purpose was to divert assets from Main Street and Grand Rivers for the conspirators' personal benefit, to move low-quality assets off Peoples' books to avoid regulatory scrutiny, and to facilitate a Merger Agreement to conceal their unlawful activity.

180. Each Defendant committed at least one overt act in furtherance of the conspiracy. These acts included diverting assets from Main Street and Grand Rivers for the conspirators' personal benefit, moving low-quality assets off Peoples' books to avoid regulatory scrutiny, facilitating a Merger Agreement to conceal their unlawful activity, and using straw borrowers to facilitate transactions enriching Peoples insiders.

181. Even if some of the Defendants did not agree to harm Plaintiffs specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of the Defendants' actions.

182. Plaintiffs were injured and continues to be injured in its business and property by the Defendants' conspiracy in violation of 18 U.S.C. § 1962(d). The unlawful actions of the Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in their business or property. Plaintiffs seek an award of damages in compensation for, among other things, the millions of dollars that the Defendants stole from Plaintiffs. Plaintiffs further seek an award of three times damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

**COUNT VI: FINANCIAL INSTITUTION FRAUD**
*[Claim Against All Defendants]*

183. The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

184. A person commits financial institution fraud when he knowingly executes or attempts to execute a scheme or artifice to defraud a financial institution or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by or under the custody or control of a financial institution, by means of pretenses, representations, or promises he or she knows to be false. *See* 720 ILCS 5/17-10.6(c).

185. A person commits misappropriation of a financial institution's property whenever he knowingly obtains or exerts unauthorized control over any of the moneys, funds, credits, assets, securities, or other property owned by or under the custody or control of a financial institution, or under the custody or care of any agent, officer, director, or employee of such financial institution. *See* 720 ILCS 5/17-10.6(a).

186. A person commits loan fraud when he or she knowingly, with intent to defraud, makes any false statement or report, or overvalues any land, property, or security, with the intent to influence in any way the action of a financial institution to act upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action, or otherwise, or the acceptance, release, or substitution of security. *See* 720 ILCS 5/17-10.6 (d).

187. As set forth above, the Defendants' fraudulent activity included diverting assets from Main Street and Grand Rivers for the conspirators' personal benefit, moving low-quality assets off Peoples' books to avoid regulatory scrutiny, facilitating a Merger Agreement to

conceal their unlawful activity, and using straw borrowers to facilitate transactions enriching Peoples insiders.

**COUNT VII: FRAUD**
*[Claim Against Peoples, Bonan II, and Botsch]*

188. The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

189. Peoples, Bonan II, and Botsch, separately and collectively, made false statements of material past or existing facts to the Plaintiffs with full knowledge that those statements were untrue.

190. As set forth above, Peoples, Bonan II, and Botsch brought loan participations, troubled loans, and other uncreditworthy borrowers to Grand Rivers and represented to Grand Rivers that they were creditworthy.

191. At the time Peoples, Bonan II, and Botsch brought these loans and borrowers to Main Street and Grand Rivers, Peoples, Bonan II, and Botsch knew them to be uncreditworthy.

192. At the time Peoples, Bonan II, and Botsch made these representations to Main Street and Grand Rivers, Peoples, Bonan II, and Botsch knew them to be false and intended to induce the Plaintiffs' reliance.

193. Main Street and Grand Rivers relied upon the statements and representations of Peoples, Bonan II, and Botsch, and extended credit to the detriment of Main Street and Grand Rivers.

194. Peoples', Bonan II's, and Botsch's actions constitute fraud, and the Plaintiffs have been and continue to be damaged as a result.

**COUNT VIII: BREACH OF FIDUCIARY DUTY**
*[Claim Against Bonan II and Botsch]*

195. Grand Rivers incorporates by reference the above paragraphs as if fully set forth herein.

196. Bonan II and Botsch, as employees and/or directors of Main Street and Grand Rivers, held positions of trust such that they are considered fiduciaries of the Plaintiffs.

197. As such, Bonan II and Botsch owed Main Street and Grand Rivers a duty to act in its best interest and to remain free from any conflict of interest.

198. As fiduciaries, Bonan II and Botsch are forbidden from acting in a manner adverse or contrary to the best interest of Main Street or Grand Rivers or from profiting from their actions to the detriment of the Plaintiffs.

199. Bonan II and Botsch elevated their personal interests and the interests of Market Street, Peoples, and the Bonan II-Controlled Entities above those of Grand Rivers and Main Street.

200. By his actions described above, Bonan II and Botsch have breached their fiduciary duty of care to Main Street and Grand Rivers, and as a result, the Plaintiffs have been and continue to be damaged.

**COUNT IX: FRAUD**
*[Claim Against All Defendants]*

201. The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

202. The Defendants, separately and collectively, made false statements of material past or existing facts to the Plaintiffs with full knowledge that those statements were untrue.

203. As set forth above, the Defendants made false statements of material facts to the Plaintiffs regarding the reasons for and purpose of the Merger Agreement, intending to deceive the Plaintiffs and knowing that Main Street and Grand Rivers would rely upon those representations.

204. At the time the Defendants made these representations to Main Street and Grand Rivers, the Defendants knew them to be false and intended to induce the Plaintiffs' reliance.

205. The Plaintiffs relied upon the Defendants' statements and representations, and took action by entering into the Merger Agreement to the detriment of Main Street and Grand Rivers.

206. The Defendants' actions constitute fraud, and the Plaintiffs have been and continue to be damaged as a result.

## COUNT X: DECLARATORY RELIEF

*[Claim Against Market Street and Peoples]*

207. The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

208. On July 12, 2015, Botsch contacted Bonan I regarding Botsch's knowledge of Bonan II's improper and illegal activities related to Grand Rivers and otherwise, and expressed in words or substance that, unless Bonan I were to do something about it, Bonan II would go to prison.

209. On August 20, 2015, Gaskins sent an email to Bonan II at his Peoples email address with the subject "PLAN" that outlined the intended terms of the acquisition of Grand Rivers by Market Street and Peoples.

210. On August 24, 2015, Market Street, at the direction of Bonan I, its Chairman, entered into a Letter of Intent to acquire the outstanding stock of Grand Rivers. Bonan II

executed the Letter of Intent on behalf of Grand Rivers in an effort to conceal rampant self-dealing, preferential transactions, and the improper transfer of low-quality assets from Peoples to Grand Rivers.

211. On October 20, 2015, Bonan II abruptly resigned from the Grand Rivers Board of Directors.

212. At the time of Bonan II's resignation, Grand Rivers had no knowledge of the self-dealing, preferential transactions, and transfer of low-quality assets, and viewed the forthcoming merger with Peoples as a favorable transaction.

213. One day after his resignation, in a telephone conversation with Stringer, Bonan II advised that he would consider reinstating himself as Chairman of the Board to get the Merger back on track,; however he also advised that Stringer would need to call Bonan I to determine whether Market Street would go forward with the Merger.

214. On October 21, 2015, Bonan I confirmed that Market Street would consider going forward with the Merger if Stringer spoke to Botsch about resigning from the Grand Rivers Board.

215. That same day, Bonan II advised Stringer that, in order for the Merger to proceed, the following conditions must be met at Grand Rivers: (a) everyone except one individual, Jake Campbell, resigns from the Board; (b) Bonan II is then able to choose his own Board of Directors; (c) Whitney Stringer becomes CEO; (d) Grady Gaskins becomes CFO; and (e) Bonan II receives ten thousand dollars ($10,000.00) per month as Chairman of the Board. When Bonan II made this demand mid-day on October 21, 2015, he stated that his conditions must be satisfied by 4:00 p.m. that afternoon.

216. Because Grand Rivers was unaware of the self-dealing, preferential transactions, and transfer of low-quality assets, and desired to go forward with the Merger, Grand Rivers acquiesced to Bonan II's demands.

217. Peoples and Market Street purported to enter into the Merger Agreement on November 27, 2015.

218. Peoples, Bonan II, Botsch, Gaskins, and other co-conspirators did not disclose the ongoing pattern of self-dealing, preferential transactions, and improper transfer of low-quality assets to Grand Rivers.

219. Peoples, Bonan I, Bonan II, and Botsch fraudulently concealed the true purpose of the Merger Agreement.

220. As a result of Peoples', Bonan I's, Bonan II's, and Botsch's fraudulent concealment of the true purpose of the Agreement, the Merger Agreement is based entirely on fraud and is void.

221. As a result of Peoples', Bonan I's, Bonan II's, and Botsch's fraudulent concealment of self-dealing, preferential transactions, and improper transfer of low-quality assets in the formation of the Merger Agreement, the Merger Agreement is void.

222. As a result of Peoples', Bonan I's, Bonan II's, and Botsch's control of Grand Rivers, and their actions with regard to its Board, the Merger Agreement is void.

223. Because of Market Street's and Peoples' control of Grand Rivers, Market Street and Peoples effectively negotiated the Merger Agreement with themselves and their insiders – not between Peoples and Grand Rivers.

224. Furthermore, the Merger Agreement was approved by Grand Rivers' unduly constituted Board of Directors, acting at the direction of Market Street and Peoples insiders who

were attempting to conceal self-dealing, preferential transactions, and the improper transfer of low-quality assets.

225. On November 27, 2015, the Merger Agreement was signed by Bonan II, purportedly on behalf of Main Street; however, Bonan II lacked any corporate authority, given the unduly constituted Board.

226. The Merger Agreement is void *ab initio* because it was the product of fraud in the form of the concealment of self-dealing, preferential transactions, and the improper transfer of low-quality assets.

227. Additionally, the Merger Agreement is voidable because, at the time Bonan II executed it, he had no actual or legal authority to act on behalf of Grand Rivers.

228. Bonan II's resignation from the Board in October 2015 rendered him ineligible under the Bylaws to rejoin the Board unless elected by the shareholders or formally appointed by the Board to fill a vacancy – neither of which occurred.

229. When Bonan II executed the Merger Agreement on behalf of Main Street, he was no longer a member of the Board, and it is unclear under what purported power Bonan II acted, as he was neither an officer nor a director of Main Street at the time the Merger Agreement was executed.

230. Even if Bonan II had been a director, directors do not have the authority to sign contracts on behalf of Main Street under its Bylaws, its Articles, or Illinois law.

231. The Board did not take proper action with respect to the Merger Agreement, nor did the Board provide Bonan II with the requisite authority.

232. Additionally, Grand River's outside counsel did not seek a fairness opinion on the terms of the Agreement.

233. The absence of the most fundamental elements typically seen in a transaction of this nature – such as a fairness opinion and a disclosure schedule – was not identified until Grand Rivers obtained independent counsel.

234. Market Street, Peoples and their insiders structured the Merger Agreement to be little more than an affiliate transaction, as evidenced by the conflicts of interest, improper and incomplete board action, and blatant one-sidedness of the Agreement.

**WHEREFORE**, Plaintiffs Grand Rivers Community Bank and Main Street Bancshares, Inc. respectfully request that the Court:

A. Award compensatory, consequential, exemplary, and punitive damages to Plaintiffs in an amount to be determined at trial;

B. Declare the Merger Agreement void;

C. Award attorneys' fees and costs to Plaintiffs in an amount to be determined at trial; and

D. Award additional damages or relief as may be determined to be just and proper in the premises.

Respectfully submitted,

/s/Brett J. Ashton

Scott J. Fandre (#6206887)
KRIEG DEVAULT LLP
30 North LaSalle Street, Suite 2800
Chicago, Illinois 60602
Phone: 312-423-9300
Fax: 312-423-9303
sfandre@kdlegal.com

Brett J. Ashton (#6324974)
KRIEG DEVAULT LLP
One Indiana Square, Suite 2800
Indianapolis, Indiana 46204
Phone: 317-636-4341
Fax: 317-636-1507
bashton@kdlegal.com

*Attorneys for Plaintiffs Grand Rivers Community Bank and Main Street Bancshares, Inc.*

KD_8655945_4.docx