UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

GRAND RIVERS COMMUNITY BANK       )
and MAIN STREET BANCSHARES, INC. )
                                                          )
       Plaintiffs,                             )
                                                          )    Case No. 3:17-cv-00266
v.                                                       )
                                                          )
H. KEITH BOTSCH,                              )
                                                          )
       Defendant.                           )
                                                          )
_____ )

## AMENDED COMPLAINT FOR DAMAGES

Plaintiffs Grand Rivers Community Bank and Main Street Bancshares, Inc. (collectively, the "Plaintiffs"), by counsel, hereby file their *Amended Complaint for Damages* against H. Keith Botsch ("Botsch" or the "Defendant") and allege and state as follows:

## INTRODUCTION

1.      The Plaintiffs bring this civil action against the Defendant seeking damages for violations of federal RICO laws, as well as damages for state law claims of financial institution fraud, fraudulent misrepresentation, breach of fiduciary duty, and fraud.

## PARTIES AND RELATED PERSONS

2.      Grand Rivers Community Bank ("Grand Rivers") is an Illinois state-chartered bank that is supervised by the Federal Deposit Insurance Corporation (the "FDIC") and the Illinois Department of Financial and Professional Regulation, Division of Banking. Grand Rivers' principal offices are located in Grand Chain, Illinois.

3.      Main Street Bancshares, Inc. ("Main Street") is a bank holding company regulated by the Federal Reserve Board, with its principal offices located in Harrisburg, Illinois. Main Street is the sole shareholder of Grand Rivers.

4.      H. Keith Botsch ("Botsch") is an individual resident of Carmi, Illinois. Botsch is a former member of Grand Rivers' Executive Committee and performed accounting work for Grand Rivers. Botsch served as President of Grand Rivers from August 2010, upon approval of the change in control, through October 2015.  Botsch is the largest  shareholder of Main Street. Botsch also owns and operates Botsch and Associates, CPA's, LLC ("Botsch and Associates"), an accounting firm with its principal office is Carmi, Illinois. Upon information and belief, at all relevant times, Botsch was a director of Peoples, as well as the Chair of its Audit Committee, and a shareholder of Market Street.

5.      Peoples National Bank, N.A. ("Peoples") is a national bank chartered and supervised by the Office of the Comptroller of the Currency. Peoples' principal offices are located in Mount Vernon, Illinois.

6.      Market Street Bancshares, Inc. ("Market Street") is a bank holding company regulated by the Federal Reserve Board, with its principal offices located in Mount Vernon, Illinois. Market Street is the sole shareholder of Peoples.

7.      Frank William Bonan ("Bonan I") is an individual resident of Mount Vernon, Illinois. Bonan I is the Chairman, President, and General Counsel of Peoples and is the Vice Chairman of Market Street. Bonan I is the father of Frank William Bonan II.

8.      Frank William Bonan II ("Bonan II") is an individual resident of Harrisburg, Illinois. Bonan II is the former Chairman of Main Street and Grand Rivers and a current director of Market Street and Peoples. Bonan II also formerly served as Peoples' President of the

Southern Illinois District. Bonan II also has ownership interests in Company #2 and Company #3. Prior to their dissolution, Bonan II had ownership interests in Company #1 and Company #5. Bonan and Bonan II are collectively referred to herein as the "Bonans."

9.      Company #1 was an Illinois limited liability company with its principal offices in Carmi, Illinois, prior to its voluntary dissolution on May 31, 2016. Botsch and Bonan II were the Managing Members of Company #1. Upon information and belief, Botsch and Bonan II held equal ownership interests in Company #1, and Botsch provided accounting services to Company #1.

10.     Company #2 is an Illinois limited liability company with its principal offices in McLeansboro, Illinois. Bonan II is the Manager of Company #2. Upon information and belief, Botsch provided accounting services to Company #2.

11.     Company #3 is an Illinois limited liability company with its principal office in Benton, Illinois. Bonan II and a Peoples insider are the Managers of Company #3.

12.     Company #4 is an Illinois limited liability company with its principal office in McLeansboro, Illinois. Company #4 is managed by a Peoples insider.

13.     Company #5 was an Illinois limited liability company with its principal offices in Benton, Illinois, prior to its involuntary dissolution on December 9, 2016. Bonan II was the registered agent and a manager for Company #5.

14.     Company #1, Company #2, Company #3, Company #4, and Company #5 are collectively referred to herein as the "Controlled Entities."

15.     Grady Gaskins ("Gaskins") is an individual resident of Harrisburg, Illinois. Gaskins began serving as Chief Financial Officer of Grand Rivers on April 16, 2015 and purported to act as a director beginning on October 19, 2015. Gaskins was also a lender for

Grand Rivers. Prior to his employment with Grand Rivers, Gaskins served as a loan officer at Peoples. Gaskins concurrently acted in a management capacity with Company #2.

## JURISDICTION & VENUE

16.     This is an action arising in part under the laws of the United States, as Grand Rivers seeks relief under the Racketeer Influenced and Corrupt Organizations Act. 28 U.S.C. § 1961, *et seq*. ("RICO"). This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1965(a). Grand Rivers further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law pursuant to 28 U.S.C. § 1367.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because the Defendant resides in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL BACKGROUND

18.     Since 2010, Peoples, Market Street, Bonan I, Bonan II, and Botsch have asserted control over and indirect ownership of Grand Rivers and Main Street without approval of the Board of Governors of the Federal Reserve System (the "Federal Reserve") and in violation of laws and bank regulations, and have operated Grand Rivers to its detriment for the primary benefit of Peoples and its individual insiders, including Botsch.

*Botsch's Interests*

19.     Botsch is the largest shareholder of Main Street and has the power to vote more than 20% of the voting securities in Main Street.

20.     Botsch served as President of Grand Rivers, as well as a member of its Executive Committee and other major bank committees, from August 2010 through October 2015.

21.     At all relevant times, Botsch was also a director and shareholder of Market Street.

22.     At all relevant times, Botsch was also a director of Peoples, as well as the Chair of its Audit Committee.

*Interstate Communications*

23.     Botsch regularly used email to transact business, approve loans, communicate with colleagues and co-conspirators, and effect the actions alleged herein.

24.     Through March 2015, the IT system and email servers of Main Street and Grand Rivers were located in Paducah, Kentucky.

25.     Upon information and belief, at all relevant times, the email servers of Market Street  and Peoples were located in Mount Vernon, Illinois.

26.     Upon information and belief, at all relevant times, the email servers of Botsch and Associates were located in Carmi, Illinois.

27.     Multiple individuals involved in the transactions alleged herein, including a Peoples insider and co-conspirator and a member  of Grand Rivers' Executive Committee, used personal Gmail accounts to communicate with Botsch and others.

28.     Upon information and belief, at all relevant times, the email servers of Gmail were located in various locations across the United States and the world.

*Leadership Control of Grand Rivers & Conflicts of Interest*

29.     In 2010, Botsch became a member of Grand Rivers' three-member Executive Committee.

30.     The Executive Committee is responsible for approving all loans made by Grand Rivers.

31.    While Botsch was a controlling member of the Executive Committee, he developed, presented, and/or approved loans that benefitted him personally or benefitted individuals or entities with which he had a relationship or interest

32.    When reviewing and approving loans  for Grand Rivers, often by interstate email communications, Botsch did not disclose conflicts of interest that may have been relevant to loans that were presented to and approved by the Executive Committee.

33.    Further, Botsch did not disclose the substandard nature of certain loan transactions to Main Street, Grand Rivers, or the sole independent member of the Grand Rivers Executive Committee.

34.    When reviewing and approving these loans for Grand Rivers, Botsch elevated the interests of himself and others above the  interests  of Grand Rivers, an entity to which he owed a fiduciary duty.

*Ownership Control of Main Street*

35.    Market Street and Peoples have asserted control over and indirect ownership of Main Street and Grand Rivers without the approval of the Federal Reserve.

36.    Market Street and Peoples violated Section 3 of the Bank Holding Company Act by acquiring control and indirect ownership of Grand Rivers without obtaining approval from Federal Bank Regulators. Any company has "control" over a bank or over any company if: (a) the company directly or indirectly or acting through one or more other persons owns, controls, or has power to vote 25 per centum or more of any class of voting securities of the bank or company; (b) the company controls in any manner the election of a majority of the directors or trustees of the bank or company; or, (c) the Board determines, after notice and opportunity for

hearing, that the company directly or indirectly exercises a controlling influence over the management or policies of the bank or company. 12 U.S.C. § 1841(a)(2).

37.     Market Street and Peoples control Main Street and Grand Rivers through the combined ownership interests of Bonan II and Botsch, who have the power to vote more than 25% of the voting securities in Main Street.

38.     Market Street and Peoples indirectly own at least 35.14% of outstanding shares of Main Street stock.

39.     Members of the Bonan family collectively own more than 25% of Market Street stock, and more than 10% of Main Street stock.

40.     Botsch owns Market Street stock and is the largest shareholder of Main Street.

*Capital Transfer to Market Street through Straw Borrowers*

41.     In the midst of the 2009 financial crisis, Congress enacted legislation to prevent the United States economy from falling into a depression, creating the Troubled Asset Relief Program ("TARP"), which was designed to provide financial institutions with access to capital.

42.     On May 15, 2009, Market Street entered into an agreement with the U.S. Department of Treasury to obtain a $20,300,000 TARP loan (the "TARP Loan") by issuing "Senior Subordinated Debt." The TARP Loan was closed in New York and upon information and belief, Market Street received proceeds therefrom via interstate wire.

43.     The terms of the TARP Loan provided that Market Street would pay interest at a rate of 7.5% on the debt for the first five years, and then at a rate of 13.5% for every year thereafter until repaid.

44.    On June 29, 2012, Botsch, the Bonans, Peoples, and Market Street engaged in an illegal transfer of capital from Grand Rivers to Market Street – the ultimate holding company of Grand Rivers – through the use of straw borrowers.

45.    On June 29, 2012, Grand Rivers extended three $490,000.00 loans to family members of a shareholder, director, and insider of Peoples. All three borrowers were in their twenties at the time the loans were extended, and none were customers of Grand Rivers.

46.    Bonan II moved that the Executive Committee approve these loans, and Botsch seconded the motion.

47.    Each loan was secured by 1,841 shares of Market Street common stock, pledged by the Peoples insider.

- The Commercial Pledge Agreement for the loan to the first family member lists a loan date of July 3, 2012 and describes the collateral as follows: "1,841 Shares of Market Street Bancshares, Inc. Stock Certificate No #XX5." Stock Certificate No. XX5 was issued to the Peoples insider on July 31, 2012.

- The Commercial Pledge Agreement for the loan to the second family member similarly lists a loan date of July 3, 2012 and describes the collateral as follows: "1,841 Shares of Market Street Bancshares, Inc. Stock Certificate No #XX6." Stock Certificate No. XX6 was issued to the Peoples insider on July 31, 2012.

- The Commercial Pledge Agreement for the loan to the third member similarly lists a loan date of July 3, 2012 and describes the collateral as follows: "1,841 Shares of Market Street Bancshares, Inc. Stock Certificate No #XX7." Stock Certificate No. 327 was issued to the Peoples insider on July 31, 2012.

Non-existent collateral was pledged on these loans.  The collateral was acquired at a later date, and money was siphoned from Grand Rivers to increase the capital of Market Street, the ultimate holding company in the enterprise.  Upon information and belief, the loan proceeds totaling $1,470,000.00 were paid from Grand Rivers to Market Street Bancshares Escrow Account (Account No. XXXXX620 at Peoples National Bank) via an interstate wire transfer on July 5, 2012.  Upon information and belief, on July 12, 2012, Market Street and Peoples used these illegally obtained funds to repay the TARP Loan to the Department of Treasury in Washington, D.C., transmitting funds through interstate wires.

Grand Rivers has lost money and been substantially injured in its business because the way these loans were structured and approved violated federal banking laws and regulations.  As a result, these loans brought Grand Rivers additional regulatory scrutiny; cost Grand Rivers money in the form of lost interest income it could have received had it been able to lend this money at market rates; and damaged Grand Rivers' reputation.

48.     On August 5, 2014, Botsch approved the renewal of these capital transfer loans via three separate interstate emails.

49.     In the approval and renewal of this capital transfer, Botsch was nominally acting on behalf of Grand Rivers, but was in fact subjugating the interests of Grand Rivers and elevating the interests of himself, Peoples, Market Street, and other people and entities.

50.     Botsch's activities related to this capital transfer were undertaken for the benefit of himself, Peoples, Peoples insiders, and other co-conspirators – to the detriment of Grand Rivers and in derogation of Botsch's fiduciary duty to the Bank.

*Loan Participations & Sales*

51.    Botsch participated  in a coordinated effort to conceal low-quality assets on the balance sheets of Market Street and Peoples through a series of loan participations and loan sales to Grand Rivers.

52.    Based on the ownership and control exerted by Peoples over Grand Rivers, Grand Rivers is considered an "affiliate" of Peoples under federal banking law. *See* 12 C.F.R. § 223.2(3).

53.    In general, a member bank may not purchase a low-quality asset from an affiliate unless, pursuant to an independent credit evaluation, the member bank had committed itself to purchase the asset before the time the asset was acquired by the affiliate. *See* 12 C.F.R. § 223.15(a); *see also* 12 C.F.R. § 223.1(c) and 12 U.S.C. § 1828(j) (provisions by which the FDIC makes 12 C.F.R. § 223.15(a) applicable to non-member banks, such as Grand Rivers)

54.    Banking regulations generally prohibit a member bank from purchasing a low-quality asset from an affiliate unless, pursuant to an independent credit evaluation, the member bank had committed itself to purchase the asset before the time the asset was acquired by the affiliate. *See* 12 C.F.R. § 223.15(a).

55.    What constitutes a "low-quality asset" is defined by the regulations to include, in part, an asset classified as "substandard," "doubtful," or "loss." 12 C.F.R. § 223.3(v).

56.    Grand Rivers routinely purchased participation interests in loans from Peoples, its affiliate, some of which would constitute low-quality asset loans (the "Participation Loans").

57.    The Participation Loans were approved by the Executive Committee, of which Botsch was a member.

58.   Many of the Participation Loans met the "low-quality asset" standard and violate the prohibition against a member bank purchasing such assets from an affiliate.

59.   The Participation Loans totaled approximately six million dollars ($6,000,000.00) prior to a partial repurchase by Peoples, and Grand Rivers expects to take losses on those that have not been repurchased.

60.   The following transactions constitute examples of these Participation Loans:

- On April 29, 2013, Peoples originated a loan to two limited liability companies (the "LLCs") in the amount of $13,642,648.70. On the same date, Grand Rivers entered into a participation agreement with Peoples in the amount of $500,000.00. On July 26, 2013, Peoples Loan Officer Brian Frerichs emailed Bonan II, indicating that the owner of the LLCs was planning to sell his property in another state and wanted to restructure his credit with Peoples. Bonan II communicated with Frerichs, eventually moving for Grand Rivers to approve the loan, and Botsch approved the transaction via interstate email. This participation was ultimately paid off.

- On February 28, 2015, Grand Rivers entered into a Participation Agreement with Peoples as to a loan extended to a corporation. Botsch approved this loan via interstate email on March 2, 2015. In late 2016, Tom Dolson, the CEO of Peoples, communicated to Stringer that Peoples wanted to extend the maturity date of the loan, explaining that, "depending on who you ask, this is a classified loan." A "classified" loan means that the loan was subject to adverse classification by regulatory authorities. As a result of such classification, Peoples requested that Grand Rivers sign a

11

new agreement extending the maturity date of the loan, but the Board never voted on or approved doing so. Peoples went ahead and moved forward with a change in the terms of the loan anyway, extending the maturity by seven years. Pursuant to the terms of the Participation Agreement, "[u]nder no circumstances . . . shall [Peoples] extend the maturity date of the loan without consent of [Grand Rivers]." On February 7, 2017 Stringer sent a letter to Peoples demanding that they buy back the loan given the clear violation of the Participation Agreement. Peoples ignored this request. On March 3, 2017, Peoples counsel left a voicemail for Grand Rivers counsel indicating that they would likely repurchase the loan if the merger were to occur.

61.     Because of credit issues, Peoples refused to repurchase some of the Participation Loans, leaving Grand Rivers with a substantial amount of low-quality assets on its books.

62.     Throughout the process of the approval of these loans participations and sales, Botsch was nominally acting on behalf of Grand Rivers, but was in fact subjugating the interests of Grand Rivers and elevating the interests of himself, Peoples, Market Street, and other people and entities.

63.     Botsch's activities related to these transactions were undertaken for the benefit of himself, Peoples, Peoples insiders, and other co-conspirators – to the detriment of Grand Rivers and in derogation of Botsch's fiduciary duty to the Bank.

*Troubled Peoples-Related Loans*

64.     Grand Rivers routinely served as a refinancing source for Peoples' loans that were considered low-quality assets, classified, or troubled loans, or loans that were experiencing credit

weakness (the "Troubled Loans") to move the potential loan loss from Peoples' balance sheet to Grand Rivers'.

65.     Peoples and its insiders, including Botsch, used its control of Grand Rivers to refinance troubled loans from Peoples to Grand Rivers to conceal a pattern of loan losses from federal bank regulators.

66.     Botsch, as a member of the Grand Rivers Executive Committee, approved these Troubled Loans.

67.     Peoples' officers and employees routinely directed and coordinated refinancing Troubled Loans from Peoples to Grand Rivers from their Peoples email addresses, and Botsch effected this activity by approving the transactions as a member of the Grand Rivers Executive Committee.

68.     The Troubled Loans total approximately ten million dollars ($10,000,000.00) and were approved by the Executive Committee while it was controlled by Peoples' insiders, including Botsch. The Troubled Loans account for approximately 21% of Grand Rivers' entire loan portfolio.

69.     The following transactions constitute examples of these Troubled Loans, of which Botsch effected Grand Rivers' approval:

- Mike Williams, a Grand Rivers Loan Officer, reviewed the request for a loan from a corporation on or around March 2015, and upon analysis of the guarantors' personal financial statements and the projected cash flow from the corporation, saw weakness in the personal guarantees and marginal cash flow. Soon after, Grand Rivers Credit Analyst Don Nave advised Mr. Williams that "[Bonan II] says we have to make the loan." Mr. Williams received numerous phone calls

from Amy Short, a Peoples loan department employee, regarding the status of the loan closing. The corporation was approved for a loan with Grand Rivers on March 17, 2015. On March 18, 2015 Candice Jones, a Commercial Account Manager with Grand Rivers submitted a request for loan approval to the Grand Rivers Executive Committee via email titled, "[Corporation] Change approval" stating, "[The loan] was closed on 03/17/2015. Lender was told by principals that PNB said for them to hold off on monthly payments until Grand Rivers was ready to refinance their loans at PNB. Lender requests approval of loan increase from $585,000 to $591,158 to cover accrued interest on loan at PNB. Also requesting 6 months interest only payments then to correct monthly P&l payments with a 7 year amortization. Let me know if you have any questions. Please reply with your responses. Thank you." On March 18, 2015, Botsch approved the loan on behalf of Grand Rivers via interstate email. On March 19, 2015, a wire transfer in the amount of $605,849.61 was transmitted across state lines from Grand Rivers to a Peoples bank account at US Bank (St. Louis, Missouri) on behalf of the corporation to satisfy outstanding Peoples loans.

- An individual borrower and his related entities (collectively, the "Borrower"), had personal and business loans with Peoples on and before 2011. The Borrower also had personal and business loans with Grand Rivers totaling approximately $1,090,978. Peoples restructured the credit with the Borrower in 2011 and made further restructuring efforts in 2013 and 2015. The Borrower continued to experience financial difficulty and the credit was downgraded again following an external loan review at Peoples in 2015. On July 24, 2015 Grand Rivers CEO

Stringer advised Bonan II via email of loans identified in a recent loan review that should be downgraded. A Grand Rivers loan with the Borrower was recommended for downgrade. In an email to Stringer, Gaskins, Don Nave, and Mike Williams from his Peoples email address, Bonan II responded, "For [him], we are restructuring all of his debts now. I am waiting on updated taxes and a financial statement from him now, so this will be cleaned up and made to look perfect also." Bonan II instructed Nave on August 12, 2015 to extend the Borrower credit whereby Grand Rivers would lend $1,395,893.00, pay $151,319.08 cash out, and refinance $150,000 of an existing Peoples loan – all of this effectively increasing Grand Rivers' exposure to the Borrower by over 1,263,537.90. Nave advised Bonan II by electronic mail on August 3, 2015 that the Borrower was continuing to experience cash flow issues and was a substandard credit risk. Bonan II responded to Nave in an electronic mail dated August 3, 2015 stating, "He is fine on cash flow. Because of the way he gets paid it is like a farmer. He had always made his payments as agreed and we have an excerpt [sic] his expenses in one year and the income in the next." Thereafter, Bonan II and Nave exchanged emails:

| | |
|---|---|
| **From:** | Bill Bonan II <Bill.BonanII@peoplesnationalbank.com> |
| **Sent:** | Wednesday, August 12, 2015 9:17 AM |
| **To:** | Don Nave |
| **Cc:** | Grady Gaskins |
| **Subject:** | Re: ▉ |

Are you asking if I give a shit Don. You have no idea what is going on. If you would like to know please let me know. You guys work on this loan or pack your shit and get out.

Sent from my iPhone

> On Aug 12, 2015, at 9:15 AM, Don Nave <dnave@grandriverscommunitybank.com> wrote:
>
> He is 77 and 41 days past due on his loans and has been downgraded to 4.
>
> -----Original Message-----
> From: Bill Bonan II [mailto:Bill.BonanII@peoplesnationalbank.com]
> Sent: Wednesday, August 12, 2015 9:13 AM
> To: Don Nave
> Cc: Grady Gaskins
> Subject: ▉
>
> Where do we stand on ▉ loan
>
> Sent from my iPhone

That same day, Gaskins submitted the restructured loan for approval to the Executive Committee. The Executive Committee, controlled by Peoples insiders, including Botsch, approved the transaction. On May 26, 2016, when the annual loan payment on the loan was due, the Borrower could not be contacted. Grand Rivers threatened to foreclose on the loans in February 2016. On April 21, 2016 Bonan II contacted Stringer stating that the Borrower was a "good friend" of Hunt Bonan and Bonan I, and that by not "taking care of Peoples customers," Grand Rivers could jeopardize the planned merger with Peoples. Bonan II made similar calls to Loan Officer and Botsch on April 20, 2016. On April 21, 2016 Botsch told Stringer and Williams that Bonan II had contacted him and advised that the loan would be repaid within two weeks. The loan remains unpaid, and has caused Grand Rivers to suffer losses.

70.     Peoples has used Grand Rivers as a dumping ground for risky, ill-advised, or low-quality loan transactions. These Troubled Loans were undertaken by Grand Rivers at the

direction of Peoples insiders for the benefit of Peoples, as they addressed deteriorating loan quality conditions at Peoples and served to transfer Peoples' loans that were considered low-quality assets, classified, or troubled loans or that were experiencing credit weakness "off-balance sheet" to avoid regulatory scrutiny. At all relevant times, Botsch was a Peoples insider, one of three members of Grand Rivers Executive Committee, which allowed him to effect this pattern of activity.

71.     Throughout the process of the approval of these Troubled Loans, Botsch was nominally acting on behalf of Grand Rivers, but was in fact subjugating the interests of Grand Rivers and elevating the interests of himself, Peoples, Market Street, and other people and entities, as he effected the transfer of the Troubled Loans from Peoples to Grand Rivers.

72.     Botsch's activities related to these loans were undertaken for the benefit of himself, Peoples, Peoples insiders, and other co-conspirators – to the detriment of Grand Rivers and in derogation of Botsch's fiduciary duty to the Bank.

73.     To date, Grand Rivers has experienced losses from the Troubled Loans in the amount of $2,230,640.44.

*Self-Dealing*

74.     A review of numerous Grand Rivers loan files has revealed a pattern of extensive self-dealing involving Peoples insiders that has resulted in significant losses to Main Street and Grand Rivers.

75.     In addition to engaging in his own self-dealing, in derogation of the fiduciary duties he owed to Grand Rivers, Botsch helped effect a pattern of self-dealing of another Peoples insider to benefit himself, his family members and friends, effectively using Grand Rivers as a personal account from which he could borrow unlimited amounts of money.

76.     The following transactions constitute examples of Botsch's self-dealing to the detriment of Grand Rivers – transactions which Botsch knowingly and intentionally effected in breach of his fiduciary duty to Grand Rivers:

- Beginning in July 2015, Botsch directed Grand Rivers to close three loans to an LLC: (1) a loan in the amount of $74,383.41 to purchase a truck and a pickup from Company A; (2) a loan in the amount of $178,085.00 to purchase equipment from Company B; and (3) a loan in the amount of $102,500 as a line of credit facility to start a business. Botsch provided information to Grand Rivers and the Executive Committee regarding these loans via multiple interstate emails. At Botsch's request, all three loans closed at the offices of Botsch and Associates on September 4, 2015. Upon information and belief, Botsch led Grand Rivers Senior Loan Officer Mike Williams to believe that Company A was owned by Company B. Botsch did not disclose to Grand Rivers that he was the registered agent for and a managing member of Company A. The cancelled check to Company A shows an endorsement stamped as follows: Peoples National Bank, NA, Botsch Associates CPAs, *****735. To date, Grand Rivers has charged off $935.31 on Loan #1; $48,326.77 on Loan #2; and $101,673.23 on Loan #3. Grand Rivers has had to post additional reserves to account for these losses.

- At the direction of Botsch, an LLC applied for a commercial loan from Grand Rivers in the amount of $160,014.00 to purchase property. One of the LLC's two managers requested and personally guaranteed the loan. The Grand Rivers Executive Committee approved the application on August 19, 2015, with Botsch indicating via an interstate email to the loan officer and Executive Committee,

"I'm fine with this." A later review of the loan file and corporate organizational documents of the LLC revealed that Botsch organized the LLC, acts as its Resident Agent, and is its only other manager. The Operating Agreement provided by the LLC in connection with the request indicated that the Manager and another individual each owned a 50% interest in the LLC; however, upon information and belief, that Operating Agreement was fraudulent. The other individual is employed by Botsch and Associates. Upon information and belief, Botsch owns 50% of the LLC, and he failed to disclose this ownership interest when the Grand Rivers Executive Committee – of which he and Bonan II represent a majority – approved the loan. The loan was repaid on August 12, 2016, from proceeds received from First Mid Illinois Bank. The proceeds check received by Grand Rivers referenced another LLC. The certificate of good standing for that LLC shows Botsch as its Registered Agent and Managing Member.

- On August 17, 2015 Botsch e-mailed Grand Rivers Senior Loan Officer Mike Williams, "Mike. [An individual] needs to borrow $60,000 for a 850J Dozer. Can you work on this for him? I own the dozer because he wanted to buy it at an auction but he is the one who has the info about the dozer. I just got involved because he had to have the money that day and all I did was loan it to him. Thanks. Keith." On August 21, 2015 Williams emailed Botsch: "I closed with [the individual] on the crawler dozer. What do we need to do with the $60,000?" After the loan was closed, Botsch instructed Williams to disburse the proceeds to Botsch Farms, LLC: "Just make the check out to Botsch Farms and bring it to the

19

meeting Monday." Botsch Farms, LLC is an Illinois limited liability company for which Botsch is the registered agent. Only after the loan proceeds were disbursed – and after two additional loans were made to the same individual borrower – did Botsch disclose that the individual borrower was a relative.

77.   Additionally, the following transactions constitute examples of self-dealing by another Peoples insider to the detriment of Grand Rivers, which Botsch knowingly and intentionally helped to effect, breaching his fiduciary duty to Grand Rivers:

- Bonan II instructed Gaskins to make two loans to a Grand Rivers employee with whom Bonan II is believed to have had a personal relationship. Bonan II sent the following email to Gaskins and the employee on July 4, 2015:

```
> On Jul 4, 2015, at 1:09 PM, Bill Bonan II <Bill.BonanII@peoplesnationalbank.com> wrote:
>
> Schedule this to close this Friday.  You can appraisal from Dave early
> this week
> 2 loans
>
> Estimates
> Commercial unsecured loan.  45,000
> 3 year term.  5.79   250 fee that we finance.  Put second mortgage on house as an abundance
> That 45,000 should be broken down as follows.   Verify these numbers on Monday
> Michael.  10,000
> Credit cards 6,000
> Early payoff. 8,000
> Down Payment 16,000
> Furniture/fix ups 5,000
> Total 45,000.  All yearly interest due on January 15th for the entire
> year.  Just or interest only Payment
>
>
> Home loan
> 62,000
>
>
> Sent from my iPhone
```

Bonan II directed that Grand Rivers extend a $62,000 loan to purchase a home. The purchase price was $78,000, and thus the loan had an LTV of approximately 80%. The structure that Bonan II outlined above would be the

unsecured loan, which would pay down the debt and act as the down payment for the purchase of the home.

Gaskins, as CFO and a lender for Grand Rivers, drafted the credit analysis and loan narrative, which he emailed to Bonan II on July 6, 2015. Both loans were sent to the Grand Rivers Executive Committee for approval on July 8, 2015. Botsch approved the loan via interstate email that same day. Then, in an apparent effort to evade regulatory scrutiny, Botsch emailed the Executive Committee on July 9, 2015, rescinding his prior approval for the "commercial" loan:

| | |
|---|---|
| From: | H Keith Botsch, CPA <cpa@botsch.com> |
| Sent: | Thursday, July 09, 2015 8:34 AM |
| To: | Candice Jones; 'Bill Bonan II'; 'Brent Clark'; Don Nave; Grady Gaskins; Mike Williams; Whitney Stringer |
| Subject: | RE: ███████ Approval |

Everyone

One of the things I do every night is review the loans hat go out and take a closer more relaxed look at the write ups. Yesterday I voted yes on ██████ loans.  In reflecting on this I'm ok with the 1st on the real estate loan but I have issues with the unsecured loan to an employee with a 3 year lock rate. I need to change my vote on the unsecured loan to NO.

Sorry I caused confusion but I think the examiners will criticize us on this one.

Keith

Gaskins then revised the unsecured loan to be a $25,000 unsecured loan and presented that loan with the original home loan of $62,000. Botsch had knowledge that this second iteration of the loan did  not follow  prudent lending practices and was not in the best  interests of Grand Rivers. This loan was not a commercial loan – it was, in fact, a loan to an employee involved in a personal relationship with a Peoples insider, to whom Botsch was beholden.

Botsch approved both loans via interstate email on July 9, 2015. The loans then closed and have since been classified. A $12,000.00 impairment has been made to the unsecured loan in Grand Rivers' allowance for loan and lease losses.

- Company #4, as of May 2015, was an Illinois limited liability company with a Peoples insider as its sole owner; and Company #3, was an Illinois limited liability company of which the Peoples insider and Bonan II are the managing members. In May 2015, Grand Rivers received a loan request from Company #4 in the amount of $592,500.00, for which the Peoples insider provided a personal guaranty as collateral. Botsch approved the loan on May 13, 2015 via interstate email. The purpose of the loan was for Company #4 to purchase a parking lot in St. Louis, Missouri. The parking lot was adjacent to an apartment building owned by Company #3 and that Company #4 had entered into a lease agreement with Company #3, whereby lease revenue would be tied to occupancy of the apartment buildings. On May 14, 2015, a wire transfer in the amount of $592,500.00 was transmitted across state lines from Grand Rivers to US Bank in St. Louis, Missouri.

Contemporaneously, Bonan II orchestrated a $1,325,000.00 loan to another Peoples insider. Botsch approved this loan via email on May 13, 2015. To obtain the loan, the insider pledged Market Street stock as collateral. Grand Rivers then-CFO Gaskins advised Bonan II on July 22, 2015 in an email: "Need to get a value or secure more bank stock for [Peoples insider] individually. We have currently 1725 shares Valued at 736,385. We need to come up to 1,325,000." Bonan II responded on July 24, 2015:

22

| | |
|---|---|
| **From:** | Bill Bonan II <Bill.BonanII@peoplesnationalbank.com> |
| **Sent:** | Friday, July 24, 2015 6:08 PM |
| **To:** | Grady Gaskins |
| **Subject:** | Re: ▮▮▮▮ Cash Flow |
| **Attachments:** | image001.jpg; image001.jpg |

For ▮▮▮▮ narrative on the bank stock loan I want you to write in the following

Peoples Natoonal Bank has been able to grow this year to approx 1,040,000,000 in assets. Last year the bank made approx 13,500,000 in net income. This is after fully finding the banks ALLL  The stock of Peoles National is held very closely between just a few families.  Stock at the bank has been sold by stock holders since around 2000.  The appraisal that is done on the stock each year really is for KSOP purposes.  This year they put a value on the stock of 1.07 times book.  After speaking with Bill Bonan Sr he had stated that the stock is so valuable that he believes being able to sale the stock to potential investors or to he or Hunt Bonan for 2 times book value on the stock is very very realistic.  Therefore we have increased the value of ▮▮▮▮ stock and have assigned a value of 1,400,000.   Plus ▮▮▮▮ has indicated that around 200,000 to 300,000 of this new money request should be paid back in the next 12 to 15 months for sure

Everything else looks fine.  Get it out and let's everything approved.  These are good loans

Sent from my iPhone

     On July 27, 2015 Botsch voted to approve the line of credit to the Peoples insider via interstate email. Bonan II abstained from the vote. Bonan II closed the transaction, and no Grand Rivers loan officer was present at the closing. Proceeds from an initial $725,000.00 draw on the line of credit were used to purchase an apartment building by Company #3. As a result of these transactions, Bonan II, through his interest in Company #3, obtained an economic benefit in violation of federal banking regulations at the expense of Grand Rivers.

- On February 28, 2014, Bonan II arranged and obtained a $300,000.00 loan through an individual straw borrower. The proceeds of this loan were used as a down payment on a building being purchased by Company #1, a company owned and controlled by Botsch and Bonan II. Company #1, on behalf of the straw borrower, made loan payments into a deposit account with Grand Rivers, and the payments were then applied to the straw borrower's loan. Bonan II, by agreement

with the straw borrower, paid this loan off on August 19, 2014, when Bonan II refinanced the debt at Bank of Marion. The loan file for this loan was never found. Botsch obtained an economic benefit through the extension of credit made to his company through a straw borrower.

- At the direction of Bonan II, Grand Rivers extended loans to LLC #1 and Individual #1, the terms of which were dictated by Bonan II. The loan to the individual (one of the guarantors of the loan to LLC #1) in the amount of $50,215.00 was also arranged and approved by Bonan II, and Botsch voted to approve it via interstate email on June 25, 2015. The individual – another straw borrower – was advised by Bonan II that Bonan II could not be the borrower because of his association with Grand Rivers, but that Bonan II would ensure that the loan was approved. As payments on the loan came due, Bonan II provided the straw borrower with money to make such payments. Upon information and belief, those loan proceeds were deposited to the individual's account, and $44,295.00 was subsequently transferred to Company #5, an entity of which Bonan II is a managing member and the agent of record.  Upon further information and belief, this transaction financed a spec-home owned by Company #5, which received sales proceeds of $50,472.19 when property at 1212 South Webster Street, Harrisburg, Illinois was sold. Yet, only $30,000 was used to pay down the debt at Grand Rivers, leaving an unsecured balance of approximately $20,000 on a classified loan.

- On March 28, 2013, Bonan II arranged and approved a $137,500.00 loan from Grand Rivers to a director and employee of Peoples, who used the proceeds of the

24

loan to purchase a home. Botsch approved this loan via interstate email on March 14, 2013. Payments on the loan were made by Company #1 (an entity owned in part and controlled by Bonan II), and checks for the payments were signed by Bonan II, who was Chairman of the Grand Rivers Board of Directors at the time. On February 19, 2016, the loan was paid in full via an interstate wire originating from Focus Bank in Charleston, Missouri.

- On January 23, 2013 Grand Rivers extended a loan to two LLC's in the amount of $490,000, secured by commercial guarantees and a commercial security agreement listing oil drilling equipment as collateral (the "Collateral"). The first LLC is an Illinois limited liability company of which two of Bonan II's friends are the managing members. Upon information and belief Botsch provided accounting services to this LLC. The second LLC was an Illinois limited liability company of which two of Bonan II's friends were the managing members. This LLC was involuntarily dissolved by the Illinois Secretary of State on June 13, 2014. Botsch was this LLC's registered agent, and on information and belief also provided it with accounting services. On June 27, 2013 Grand Rivers extended a second loan to the same two LLC's in the amount of $89,000, the proceeds of which were distributed via interstate wire. On May 8, 2014 Grand Rivers refinanced these two existing loans into a single loan in the amount of $640,500, secured by the Collateral. Botsch approved this loan via interstate email on May 7, 2014. Peoples also held an interest in the Collateral. On or about October 9, 2015, without Grand River's knowledge or consent, the first of the two LLC's sold its ownership interest in the Collateral to "Purchaser" representing the

25

equipment to be "free and clear" of any encumbrances or liens.   On October 9,

2015 an officer of the Borrower with whom Bonan II was believed to be

romantically involved, e-mailed Bonan II:

From: ███████████████████████████
To: "Fifty" <Bill.BonanII@peoplesnationalbank.com>
Subject: UCC-1 release

Good morning,

We are needing a UCC-1 release from Grand Rivers and Peoples on Rig ██ to attach to the
purchase agreement as Exhibit C.  If at all possible, can we please get this done today?

Thanks,

████

Sent from my iPhone

Bonan II then had the following e-mail exchange with Gaskins:

From:          Bill Bonan II <Bill.BonanII@peoplesnationalbank.com>
Sent:          Friday, October 09, 2015 5:20 PM
To:            Grady Gaskins
Subject:       Re: UCC-1 release

She said she just emailed you

Sent from my iPhone

> On Oct 9, 2015, at 5:16 PM, Grady Gaskins <ggaskins@grandriverscommunitybank.com> wrote:
>
> Our ucc-1 is not a blanket it is just on this specific rig, so all I need to do is prepare the termination and I can send out. I
won't file it until payment is received. Just need the attachments to confirm its same equipment and same wording in
ucc and purchase agreement. I can take care of it right now.
>
> Sent from my iPhone
>
>> On Oct 9, 2015, at 5:01 PM, Bill Bonan II <Bill.BonanII@peoplesnationalbank.com> wrote:
>>
>> Get these releases to ████
>>
>> Sent from my iPhone

On October 16, 2015 Bonan II sent Gaskins a follow up e-mail:

| From: | Bill Bonan II <Bill.BonanII@peoplesnationalbank.com> |
|---|---|
| Sent: | Friday, October 16, 2015 8:44 AM |
| To: | Grady Gaskins |
| Subject: | Give me a call |

Has to do with █████ release

Sent from my iPhone

On November 11, 2015 an employee of the LLC sent an e-mail to the Purchaser's employee stating, "All components of rig [X] have left LLC #1's yard and is now in possession of Purchaser. Per our agreement now that this is completed it is your responsibility to contact the escrow agents to release the remaining 10% of funds to the LLC #1." In response Purchaser advised the LLC's employee that they would require Peoples Bank and Grand Rivers Bank to file a UCC-1 Release prior to returning any funds left in escrow. On November 13, 2015 an LLC employee sent an e-mail to Bonan II stating:

From: ████████████████████████████████
Date: November 13, 2015 at 11:00:54 AM CST
To: "Bill.bonanii@peoplesnationalbank.com<mailto:Bill.bonanii@peoplesnationalbank.com>"
<Bill.bonanii@peoplesnationalbank.com<mailto:Bill.bonanii@peoplesnationalbank.com>>, Scott Collins
<Scott.Collins@peoplesnationalbank.com<mailto:Scott.Collins@peoplesnationalbank.com>>
Subject: FW: Rig Loads Completed

Bill –

███ wants to know how we handle the UCC-1 from Grand Rivers. Even though there is no collateral for rig ██ at Grand Rivers ███ still wants a recorded UCC-1, does someone at Grand Rivers have this to send to me? I don't have anyone's information there to contact regarding this.

Thanks,
███

In response to the request, Bonan II ordered the Gaskins and Grand River's employee Kassie Winters to file a release of the Collateral in an e-mail:

27

| | |
|---|---|
| **From:** | Bill Bonan II <Bill.BonanⅡ@peoplesnationalbank.com> |
| **Sent:** | Friday, November 13, 2015 11:02 AM |
| **To:** | Grady Gaskins; ███████████; Kassie Winters |
| **Subject:** | Fwd: Rig Loads Completed |

Kassie/Grady  Get this bulkshit done this morning.  Do both of you understand me

Sent from my iPhone

> As a result of Bonan II's order to release the Collateral to obtain an economic
> benefit for his friend and believed romantic interest, Grand Rivers was left in an
> unsecured position on an over $500,000 credit. Upon realizing their unsecured
> interest, Grand Rivers demanded that the LLCs execute a change in terms
> agreement on March 8, 2016 to obtain a blanket UCC security filing. Upon doing
> so Grand Rivers learned that Peoples had asserted a superior lien interest in the
> Collateral. This credit has since defaulted, and Grand Rivers has suffered a
> substantial loss.

78.     Botsch's activities related to these loans were undertaken for the benefit of
himself, Peoples, Peoples insiders, and other co-conspirators – to the detriment of Grand Rivers
and in derogation of Botsch's fiduciary duty to the Bank.

*The Merger Agreement*

79.     Upon information and belief, on or about July 12, 2015, Botsch contacted Bonan I
via interstate text message regarding Botsch's knowledge of Bonan II's improper activities
related to Grand Rivers, and expressed in words or substance that, unless Bonan I were to do
something about it, Bonan II would go to prison.

80.     On August 20, 2015, Gaskins sent an email to Bonan II at his Peoples email
address with the subject "PLAN" that outlined the intended terms of the acquisition of Grand
Rivers by Market Street and Peoples.

81.     On August 24, 2015, Market Street, at the direction of Bonan I, its Chairman, entered into a Letter of Intent to acquire the outstanding stock of Grand Rivers. Bonan II executed the Letter of Intent on behalf of Grand Rivers in an effort to conceal rampant self-dealing, preferential transactions, and the improper transfer of low-quality assets from Peoples to Grand Rivers.

82.     Because Main Street and Grand Rivers were unaware of the self-dealing, preferential transactions, and transfer of low-quality assets, they believed it was in their best interest to go forward with the Merger.

83.     Peoples and Market Street purported to enter into the Merger Agreement with Main Street and Grand Rivers on November 27, 2015.

84.     Peoples insiders, including Botsch and other co-conspirators, did not disclose the ongoing pattern of self-dealing, preferential transactions, and improper transfer of low-quality assets to Main Street and Grand Rivers.

85.     Peoples insiders, including Botsch, fraudulently concealed the true purpose of the Merger Agreement.

86.     As a result of this fraudulent concealment of the true purpose of the Merger Agreement, the Agreement was based entirely on fraud.

87.     The purported Merger was a contrived effort to conceal underlying self-dealing, preferential transactions, and improper transfer of low-quality assets, and Botsch was a knowing and active participant in that concealment and the associated Merger.

88.     Botsch's activities related to the Merger Agreement were undertaken for the benefit of himself, Peoples, Peoples insiders, and other co-conspirators – to the detriment of Grand Rivers and in derogation of Botsch's fiduciary duty to the Bank.

## COUNT I: CIVIL RICO
*Conduct or Participation in the Affairs of an Enterprise through a*
*Pattern of Racketeering Activity (18 U.S.C. § 1962(c))*

89.     The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

90.     Botsch is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

91.     Botsch violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

92.     <u>The Enterprise.</u> Botsch, the Bonans, Market Street, and Peoples, together with the Controlled Entities, individually, collectively, or  in some combination, form an association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. There may be other members of the Enterprise that are unknown at this time.

93.     The Enterprise has engaged in, and their activities have affected, interstate commerce.

94.     <u>Pattern of Racketeering Activity.</u>  Botsch, who is associated with or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and 1961(5) and 1962. The racketeering activity was made possible by the Defendant's regular and repeated use of the facilities and services of the enterprise. Botsch had the specific intent to engage in the substantive RICO violation alleged herein.

95.     Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Botsch committed at least two such acts, or aided and abetted such acts.

96.     The acts of racketeering were not isolated, but rather were related in that they had the same purpose and result, participants, victims and methods of commission. Further, the acts of racketeering have been continuous. There was repeated conduct during the period of time beginning in August 2010 and continuing to the present, and there is a continued threat of repetition of such conduct.

97.     The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond racketeering activity. Rather they existed separate and apart from the pattern of racketeering activity for, in some instances, legitimate business purposes. Market Street and Peoples have had and do have, upon information and belief, legitimate business plans outside of the pattern of racketeering activity.

98.     Plaintiffs specifically allege that Botsch participated in the operation and management of the association-in-fact enterprise and the alternative-enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

99.     <u>Predicate Act: Mail and Wire Fraud in Violation of 18 U.S.C. § 1341 and 1343.</u> Botsch committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that he devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain money or property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. For the purpose of effecting the scheme or artifice, Botsch caused delivery of various documents and things by the U.S. Mail or by private or commercial carriers, or received such therefrom. Botsch also transmitted or caused to be transmitted by means of wire communications

31

in interstate commerce various writings, signs, and signals. The acts set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. Botsch undertook his actions in connection with the self-dealing, preferential transactions, and improper transfer of low-quality assets with the understanding that the mail would be used for the transmittal of loan documentation and that funds would be wired across state lines. These acts were done intentionally and knowingly with the specific intent to advance the Defendant's, and the enterprise's, scheme or artifice.

100.     Predicate Act: Bank Fraud in Violation of 18 U.S.C. § 1344. Botsch committed acts constituting indictable offenses under 18 U.S.C. § 1344 in that he devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain moneys, funds, credits, assets, securities, and other property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. Plaintiffs reasonably and justifiably relied upon the Defendant's false representations, false pretenses and deceptive communications, and Plaintiffs have been damaged as a direct and proximate result of Botsch's participation in such enterprise as alleged herein.

101.     Continuity of Conduct. Botsch's violations of state and federal law, as set forth herein, each of which have directly and proximately injured the Plaintiffs and other market participants, constituted a continuous course of conduct spanning a period from approximately 2010 to present, which was intended to obtain moneys, funds, credits, assets, securities, and other property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961 (1), (5).

102.    Upon information and belief, Botsch has conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

103.    Botsch and Bonan II, together, remain controlling shareholders of Market Street and thus retain the ability to continue to the affairs of the enterprise alleged herein.

## COUNT II: CIVIL RICO
*Conduct or Participation in the Affairs of an Enterprise through a*
*Pattern of Racketeering Activity (18 U.S.C. § 1962(c))*

104.    The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

105.    Botsch is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

106.    Botsch violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs, and as further described below.

107.    <u>The Enterprise.</u> Main Street and Grand Rivers form an association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4). While Main Street and Grand Rivers are legitimate businesses separate and apart from the pattern of racketeering, Botsch – along with the Bonans, Peoples, and Market Street, through their continuing pattern of racketeering activity set forth herein – infiltrated Main Street and Grand Rivers, associated with them, and managed them for their own illegal purpose.

108.    The Enterprise has engaged in, and their activities have affected, interstate commerce.

109.   <u>Pattern of Racketeering Activity.</u>  Botsch, who is associated with or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and 1961(5) and 1962. The racketeering activity was made possible by the Defendant's regular and repeated use of the facilities and services of the enterprise. Botsch had the specific intent to engage in the substantive RICO violation alleged herein.

110.   Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Botsch committed at least two such acts, or aided and abetted such acts.

111.   The acts of racketeering were not isolated, but rather were related in that they had the same purpose and result, participants, victims and methods of commission. Further, the acts of racketeering have been continuous. There was repeated conduct during the period of time beginning in August 2010 and continuing to the present, and there is a continued threat of repetition of such conduct.

112.   <u>Predicate Act: Mail and Wire Fraud in Violation of 18 U.S.C. § 1341 and 1343.</u> Botsch committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that he devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain money or property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. For the purpose of effecting the scheme or artifice, Botsch caused delivery of various documents and things by the U.S. Mail or by private or commercial carriers, or received such therefrom. Botsch also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs, and signals. The acts set forth above were done

34

with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. Botsch undertook his actions in connection with the self-dealing, preferential transactions, and improper transfer of low-quality assets with the understanding that the mail would be used for the transmittal of loan documentation and that funds would be wired across state lines. These acts were done intentionally and knowingly with the specific intent to advance the Defendant's, and the enterprise's, scheme or artifice.

113.   <u>Predicate Act: Bank Fraud in Violation of 18 U.S.C. § 1344.</u> Botsch committed acts constituting indictable offenses under 18 U.S.C. § 1344 in that he devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain moneys, funds, credits, assets, securities, and other property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. Plaintiffs reasonably and justifiably relied upon the Defendant's false representations, false pretenses and deceptive communications, and Plaintiffs have been damaged as a direct and proximate result of Botsch's participation in such enterprise as alleged herein.

114.   <u>Continuity of Conduct.</u> Botsch's violations of state and federal law as set forth herein, each of which have directly and proximately injured the Plaintiffs and other market participants, constituted a continuous course of conduct spanning a period from approximately 2010 to present, which was intended to obtain moneys, funds, credits, assets, securities, and other property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961 (1), (5).

115.    Upon information and belief, Botsch has conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

116.    Botsch and Bonan II, together, remain controlling shareholders of Market Street and thus retain the ability to continue to the affairs of the enterprise alleged herein.

## COUNT III: CIVIL RICO
*Use of a Pattern of Racketeering Activity to Acquire or Maintain Control over an Enterprise*
*(18 U.S.C. § 1962(b))*

117.    The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

118.    Botsch is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

119.    Botsch violated 18 U.S.C. § 1962(b) by the acts described in the prior paragraphs, and as further described below.

120.    <u>The Enterprise.</u> Main Street and Grand Rivers form an association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4). While Main Street and Grand Rivers are legitimate businesses separate and apart from the pattern of racketeering, Botsch – along with the Bonans, Peoples, and Market Street, through their continuing pattern of racketeering activity set forth herein – infiltrated Main Street and Grand Rivers, associated with them, and managed them for their own illegal purpose.

121.    The Enterprise has engaged in, and their activities have affected, interstate commerce.

122.     Pattern of Racketeering Activity.  Botsch, who is and was associated with or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and 1961(5) and 1962. The racketeering activity was made possible by the Defendant's regular and repeated use of the facilities and services of the enterprise. Botsch had the specific intent to engage in the substantive RICO violation alleged herein.

123.     Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B), as more specifically alleged below. Botsch committed at least two such acts, or aided and abetted such acts.

124.     The acts of racketeering were not isolated, but rather were related in that they had the same purpose and result, participants, victims and methods of commission. Further, the acts of racketeering have been continuous. There was repeated conduct during the period of time beginning in August 2010 and continuing to the present, and there is a continued threat of repetition of such conduct.

125.     Predicate Act: Mail and Wire Fraud in Violation of 18 U.S.C. § 1341 and 1343. Botsch committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1343 in that he devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain money or property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. For the purpose of effecting the scheme or artifice, Botsch caused delivery of various documents and things by the U.S. Mail or by private or commercial carriers, or received such therefrom. Botsch also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs, and signals. The acts set forth above were done

with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. Botsch undertook his actions in connection with the self-dealing, preferential transactions, and improper transfer of low-quality assets with the understanding that the mail would be used for the transmittal of loan documentation and that funds would be wired across state lines. These acts were done intentionally and knowingly with the specific intent to advance the Defendant's, and the enterprise's, scheme or artifice.

126.   Predicate Act: Bank Fraud in Violation of 18 U.S.C. § 1344. Botsch committed acts constituting indictable offenses under 18 U.S.C. § 1344 in that he devised or intended to devise a scheme or artifice to defraud Grand Rivers or to obtain moneys, funds, credits, assets, securities, and other property from Grand Rivers by means of false or fraudulent pretenses, representations or promises. Plaintiffs reasonably and justifiably relied upon the Defendant's false representations, false pretenses and deceptive communications, and Plaintiffs have been damaged as a direct and proximate result of Botsch's participation in such enterprise as alleged herein.

127.   Continuity of Conduct. Botsch's violations of state and federal law as set forth herein, each of which have directly and proximately injured the Plaintiffs and other market participants, constituted a continuous course of conduct spanning a period from approximately 2010 to present, which was intended to obtain moneys, funds, credits, assets, securities, and other property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961 (1), (5).

128.    Upon information and belief, Botsch has conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(b).

129.    Botsch and Bonan II, together, remain controlling shareholders of Market Street and thus retain the ability to continue to the affairs of the enterprise alleged herein.

## COUNT IV: CIVIL RICO
*Conspiracy to Violate RICO (18 U.S.C. § 1962(d))*

130.    The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

131.    In violation of 18 U.S.C. § 1962(d), Botsch knowingly, willfully and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity, as alleged in the prior paragraphs.

132.    The conspiracy commenced at least as early as 2010 and is ongoing.

133.    The conspiracy's purpose was to divert assets from Main Street and Grand Rivers for the conspirators' personal benefit, to move low-quality assets off Peoples' books to avoid regulatory scrutiny, and to facilitate a Merger Agreement to conceal their unlawful activity.

134.    Each co-conspirator, including the Defendant, committed at least one overt act in furtherance of the conspiracy. These acts included diverting assets from Main Street and Grand Rivers for the conspirators' personal benefit, moving low-quality assets off Peoples' books to avoid regulatory scrutiny, facilitating a Merger Agreement to conceal their unlawful activity, and using straw borrowers to facilitate transactions enriching Peoples insiders.

135.    Even if some of the co-conspirators did not agree to harm Plaintiffs specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiffs was a reasonably foreseeable consequence of the Defendant's actions.

136.     Plaintiffs were injured and continues to be injured in its business and property by the conspiracy in violation of 18 U.S.C. § 1962(d). The unlawful actions of the Defendant and other co-conspirators have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in their business or property. Plaintiffs seek an award of damages in compensation for, among other things, the millions of dollars that the Defendant and co-conspirators stole from Plaintiffs. Plaintiffs further seek an award of three times damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

## COUNT V: FINANCIAL INSTITUTION FRAUD

137.     The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

138.     A person commits financial institution fraud when he knowingly executes or attempts to execute a scheme or artifice to defraud a financial institution or to obtain any of the moneys, funds, credits, assets, securities, or other property owned by or under the custody or control of a financial institution, by means of pretenses, representations, or promises he or she knows to be false. *See* 720 ILCS 5/17-10.6(c).

139.     A person commits misappropriation of a financial institution's property whenever he knowingly obtains or exerts unauthorized control over any of the moneys, funds, credits, assets, securities, or other property owned by or under the custody or control of a financial institution, or under the custody or care of any agent, officer, director, or employee of such financial institution. *See* 720 ILCS 5/17-10.6(a).

140.     A person commits loan fraud when he or she knowingly, with intent to defraud, makes any false statement or report, or overvalues any land, property, or security, with the intent

to influence in any way the action of a financial institution to act upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, or loan, or any change or extension of any of the same, by renewal, deferment of action, or otherwise, or the acceptance, release, or substitution of security. *See* 720 ILCS 5/17-10.6 (d).

141.    As set forth above, the Defendant's fraudulent activity included diverting assets from Main Street and Grand Rivers for his and his conspirators' personal benefit, moving low-quality assets off Peoples' books to avoid regulatory scrutiny, facilitating a Merger Agreement to conceal their unlawful activity, and using straw borrowers to facilitate transactions enriching Botsch and Peoples insiders.

## COUNT VI: FRAUD

142.    The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

143.    Botsch made false statements of material past or existing facts to the Plaintiffs with full knowledge that those statements were untrue.

144.    As set forth above, Botsch approved and effected loan participations, troubled loans, and other uncreditworthy borrowers and transactions to Grand Rivers and misrepresented the nature thereof to Grand Rivers.

145.    At the time these loans and borrowers were brought to Main Street and Grand Rivers and approved by Botsch, he knew them to be troubled and/or uncreditworthy.

146.    At the time Botsch made these representations to Main Street and Grand Rivers, he knew them to be false and intended to induce the Plaintiffs' reliance.

147.    Main Street and Grand Rivers relied upon these statements and representations and extended credit to the detriment of Main Street and Grand Rivers.

148.    Botsch's actions constitute fraud, and the Plaintiffs have been and continue to be damaged as a result.

## COUNT VII: BREACH OF FIDUCIARY DUTY

149.    Grand Rivers incorporates by reference the above paragraphs as if fully set forth herein.

150.    Botsch, as an employee and/or director of Main Street and Grand Rivers, held a positions of trust such that he is and was considered a fiduciary of the Plaintiffs.

151.    As such, Botsch owed Main Street and Grand Rivers a duty to act in its best interest and to remain free from any conflict of interest.

152.    As a fiduciary, Botsch was and is forbidden from acting in a manner adverse or contrary to the best interest of Main Street or Grand Rivers or from profiting from his actions to the detriment of the Plaintiffs.

153.    Botsch elevated his personal interests and the interests of Market Street, Peoples, Peoples insiders, and other individuals and entities above those of Grand Rivers and Main Street.

154.    By his actions described above, Botsch breached his fiduciary duty of care to Main Street and Grand Rivers, and as a result, the Plaintiffs have been and continue to be damaged.

## COUNT VIII: FRAUD

155.    The Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

156.    Botsch made false statements of material past or existing facts to the Plaintiffs with full knowledge that those statements were untrue.

157.    As set forth above, Botsch made false statements of material facts to the Plaintiffs regarding the reasons for and purpose of the Merger Agreement, intending to deceive the Plaintiffs and knowing that Main Street and Grand Rivers would rely upon those representations.

158.    At the time Botsch made these representations to Main Street and Grand Rivers, he knew them to be false and intended to induce the Plaintiffs' reliance.

159.    The Plaintiffs relied upon the statements and representations of Botsch and other co-conspirators, and took action by entering into the Merger Agreement to the detriment of Main Street and Grand Rivers.

160.    Botsch's actions constitute fraud, and the Plaintiffs have been and continue to be damaged as a result.

**WHEREFORE**, Plaintiffs Grand Rivers Community Bank and Main Street Bancshares, Inc. respectfully request that the Court:

A.    Award compensatory, consequential, exemplary, and punitive damages to Plaintiffs in an amount to be determined at trial;

B.    Award attorneys' fees and costs to Plaintiffs in an amount to be determined at trial; and

C.    Award additional damages or relief as may be determined to be just and proper in the premises.

Respectfully submitted,

/s/Lauren C. Sorrell
Brett J. Ashton (#6324974)
Thomas J. Costakis (#4314-49), *pro hac vice*
Lauren C. Sorrell (#30895-49), *pro hac vice*
KRIEG DeVAULT LLP
One Indiana Square, Suite 2800
Indianapolis, Indiana  46204
Phone:  317-636-4341
Fax:  317-636-1507
bashton@kdlegal.com
tcostakis@kdlegal.com
lsorrell@kdlegal.com

Scott J. Fandre (#6206887)
KRIEG DeVAULT LLP
30 North LaSalle Street, Suite 2800
Chicago, Illinois  60602
Phone:  312-423-9300
Fax:  312-423-9303
sfandre@kdlegal.com

*Attorneys for Plaintiffs*
*Grand Rivers Community Bank and*
*Main Street Bancshares, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 2, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all attorneys of record:

James D. Johnson
Angela L. Freel
JACKSON KELLY PLLC
221 NW Fifth Street
P.O. Box 1507
Evansville, IN  47706
jdjohnson@jacksonkelly.com
alfreel@jacksonkelly.com

/s/Lauren C. Sorrell
Lauren C. Sorrell

KD_9156852_6.docx